# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION | MDL No. 2545 |
| | Master Docket Case No. 1:14-cv-01748 |
| | Honorable Matthew F. Kennelly |
| ALLIED SERVICES DIVISION WELFARE FUND, on behalf of itself and all others similarly situated, | CIVIL ACTION NO. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| vs. | JURY TRIAL DEMANDED |
| ABBVIE INC., ABBOTT LABORATORIES, ABBOTT PRODUCTS, INC., SOLVAY AMERICA, INC., SOLVAY PHARMACEUTICALS, INC., SOLVAY S.A., UNIMED PHARMACEUTICALS, LLC, BESINS HEALTHCARE INC., BESINS HEALTHCARE S.A., AUXILIUM PHARMACEUTICALS, INC., GLAXOSMITHKLINE LLC, OSCIENT PHARMACEUTICALS, INC., and ENDO PHARMACEUTICALS, INC., | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Pursuant to the Case Management Order No. 12 allowing direct filing in this MDL court,

Plaintiff Allied Services Division Welfare Fund (hereinafter, "ASD Fund"), on behalf of itself

and all others similarly situated, by and through counsel, brings this class action complaint

against AbbVie Inc., Abbott Laboratories, Abbott Products, Inc., Solvay America, Inc., Solvay

Pharmaceuticals, Inc., Solvay S.A., Unimed Pharmaceuticals, LLC, Besins Healthcare Inc.,

Besins Healthcare S.A., Auxilium Pharmaceuticals, Inc., GlaxoSmithKline LLC, Oscient

Pharmaceuticals, Inc., and Endo Pharmaceuticals, Inc. (collectively "Defendants"), and alleges the following upon information and belief and investigation of counsel:

## I.     <u>NATURE OF THE ACTION</u>

1. For more than a decade, testosterone replacement therapy drugs (hereinafter "TRT drugs") were deceptively marketed in a scheme to transform the male aging process into a purely fabricated curable disease state variously labeled by Defendants as "late-onset male hypogonadism," "Andropause," or simply "Low T." Defendants then marketed and promoted the TRT drugs to third-party payors ("TPPs"), patients, and physicians for "Andropause" and as an "off-label" treatment for a multitude of medical problems, which were not approved by the U.S. Food and Drugs Administration ("FDA"), nor effective for such uses, so-called "off-label" uses, as described *infra*.

2. This case is brought by Plaintiff ASD Fund on behalf of itself and a class of consumers and third party payors (hereinafter, "Class Members") who paid all or a portion of the cost of AndroGel® (hereinafter "AndroGel") and Testim® ("Testim"), both of which are testosterone replacement therapy drugs marketed by the Defendants.

3. TPPs and consumers were financially injured as a direct result of Defendants' respective fraudulent marketing schemes by paying for TRT drugs that, unbeknownst to TPPs and consumers until recently, did not work as had been advertised and promoted. This carefully-orchestrated scheme involved both material omissions, *i.e.*, deliberate concealment of material information and carefully crafted promotional programs, both of which were designed to induce consumers, physicians, healthcare providers and third-party payors to prescribe, use and/or purchase TRT drugs.

2

4.      As a result of Defendants' aggressive marketing and promotion efforts, sales of TRT drugs grew 90% in the five years leading up to 2012.  Rather than issue proper warnings and provide accurate information about TRT drugs' risks and benefits, Defendants chose instead to keep their deceptive propaganda and marketing machine running full steam ahead without taking any affirmative steps to correct the misinformation and deceptive advertising schemes that they had and continued to perpetrate, ensuring that they would continue to maximize the prescription and sale of TRT drugs so long as consumers, third-party payors, prescribing physicians, healthcare providers, and the medical community remained unaware of TRT drugs' true risks.

5.      It has been recently established that in addition to being ineffective for the vast majority of patients prescribed, Defendants have concealed serious side effects, including heart attacks, and other adverse cardiovascular and thromboembolic events that Defendants knew or should have known were associated with TRT drug use.

6.      By knowingly and actively promoting TRT drugs as a safe and effective cure for the male aging process without disclosing the drugs' true benefits and risks, Defendants respective schemes concealed the fact that the overwhelming majority of TRT patients did not and do not suffer from diagnosed hypogonadism, the only condition for which TRT drugs are indicated for treatment by the FDA, causing physicians to write unnecessary and potentially unsafe prescriptions for TRT drugs over safer, less costly medications, and caused Plaintiff and members of the Class to pay for more TRT drugs prescriptions than it would have absent Defendants' unlawful conduct.

7.      Defendants' complimentary marketing strategies specifically targeted off-label drug use for patients with age-appropriate testosterone levels and patients with erectile

dysfunction, diabetes, depression and obesity (among other off-label promotions). Plaintiff and members of the Class were denied the opportunity to make fully informed decisions about whether and how to include TRT drugs on their formularies and paid for more prescriptions than it would have absent Defendants' unlawful conduct.

8.      Defendants' omissions of, and deliberate misrepresentations related to, critical information regarding the use of TRT drugs have caused financial harm to Plaintiff and the Class, who hereby seek compensatory, punitive and statutory damages, injunctive relief to prevent Defendants from continuing their unlawful activities, reasonable attorneys' fees and such other just relief as the Court may award.

## II.      PARTIES

9.      Plaintiff Allied Services Division Welfare Fund ("ASD Fund") is a health and welfare benefit fund with its principal place of business at 53 West Seegers Road, Arlington Heights, Illinois, 60005, and is involved in the business of providing health and pension benefits to covered lives. ASD Fund is a multi-employer employee welfare benefit plan, within the meaning of the Employee Retirement Income Security Act, 29 U.S.C. § 1001(2), and § 1002(37). Plaintiff ASD Fund has paid or incurred costs for prescriptions of TRT drugs dispensed to covered lives in several states. These prescriptions would have been restricted or priced differently if the FDA, Plaintiff's Pharmacy Benefit Manager ("PBM") and/or prescribers had truthful and complete information about the TRT drugs.

10.      At all times relevant, Plaintiff ASD Fund has paid and/or provided reimbursement for some or the entire purchase price for TRT drugs, namely AndroGel and Testim during the Class Period.   As a result of Defendants wrongful conduct alleged herein, Plaintiff ASD has been injured.

4

11.     Defendant Solvay S.A. is a corporation incorporated in Belgium. Its principal place of business is Rue du Prince Albert 33, B-1050 Brussels – Belgium.  At all times material hereto, Solvay S.A. has conducted extensive business throughout the United States, including regularly availing itself as a plaintiff of the United States courts. *See, e.g., Solvay, S.A. v. Honeywell Int'l Inc.,* Civ. No. 2012-1660 (Fed. Cir.).

12.     Defendant Solvay America, Inc. is a corporation incorporated in the state of Delaware. Its principal place of business is 3333 Richmond Avenue, Houston Texas 77098. Defendant Solvay America, Inc. conducts extensive business throughout the United States, including in the State of Illinois.  At all times relevant, Solvay America, Inc. was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, the prescription testosterone replacement therapy drugs sold under the name AndroGel throughout the United States, including in the State of Illinois.

13.     Defendant Solvay Pharmaceuticals, Inc. is a corporation incorporated in the State of Delaware with its principal place of business in Marietta, Georgia. Defendant Solvay Pharmaceuticals, Inc. conducts extensive business throughout the United States, including in the State of Illinois.  At all times relevant, Solvay Pharmaceuticals Inc. was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, the prescription testosterone replacement therapy drugs sold under the name AndroGel throughout the United States, including in the State of Illinois.

14.     Defendant Unimed Pharmaceuticals, LLC f/k/a Unimed Pharmaceuticals, Inc. ("Unimed") is a limited liability company organized and existing under the laws of Delaware, with its headquarters and principal place of business at 1 North Waukegan Road, North Chicago,

Illinois, 60064. Unimed is a wholly-owned subsidiary of Defendant AbbVie, Inc. and a direct, wholly-owned subsidiary of Defendant AbbVie Products. Unimed is the registered owner of the trademark for AndroGel that is registered with the United States Patent and Trademark Office.

15. Defendant Besins Healthcare Inc. f/k/a Besins-Iscovesco U.S., Inc. ("Besins Inc.") is a corporation organized and existing under the laws of the State of Delaware. Besins Healthcare Inc. has its principal place of business at 607 Herndon Parkway, Suite 210, Herndon, Virginia 20170. Besins Healthcare Inc. is a wholly-owned subsidiary of Besins Healthcare, S.A.

16. Defendant Besins Healthcare, S.A. f/k/a Laboratories Besins-Iscovesco, S.A. ("Besins S.A.") is a privately held corporation with its headquarters in Bangkok, Thailand, at the following address: Besins Healthcare, S.A., 283/92 Home Place Office Building, 18th Floor Sukhumvit 55, Klong Ton Nua Wattana, Bangkok 10110, Thailand. Besins Healthcare, S.A. developed the pharmaceutical formulation for AndroGel in collaboration with Unimed. At all relevant times, Besins S.A. has conducted extensive business throughout the United States, including regularly availing itself as a plaintiff of the United States Courts. *See, e.g., Unimed Pharm., LLC, Besins Healthcare Inc., and Besins Healthcare Luxembourg SARL v. Perrigo Co., Perrigo Israel Pharm. Ltd., and Perrigo UK FINCO Ltd*, Civ. No. 1:14-cv-00985-RGA (D. Del.). At all relevant times, Besins S.A. and Besins Inc. owned rights to sell AndroGel in the United States. At all relevant times, Besins S.A. manufactured AndroGel for sale in the United States.

17. Defendant Abbott Products, Inc. is a Georgia corporation whose principal business is the development, manufacture, and sale of health care products and services, including pharmaceuticals. Abbott Products, Inc. conducts extensive business throughout the United States, including in the State of Illinois. On February 16, 2010, Abbott Laboratories acquired Solvay Pharmaceuticals for EUR 4.5 billion ($6.2 billion). Abbott Laboratories'

purchase of Solvay Pharmaceuticals has resulted in the substantial continuity of Solvay Pharmaceuticals' business practices. After the acquisition, Abbott Laboratories renamed Solvay Pharmaceuticals "Abbott Products, Inc." Abbott Products, Inc. has continued to produce and market Solvay Pharmaceuticals' products, such as AndroGel. Abbott Products, Inc. has retained some of Solvay Pharmaceuticals' employees in doing so. At all times relevant, Abbott Products, Inc. was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, the prescription testosterone replacement therapy drugs sold under the name AndroGel throughout the United States, including in the State of Illinois.

18. Defendant AbbVie Inc. ("AbbVie") was incorporated in Delaware on April 10, 2012. AbbVie's principal place of business is Chicago, Illinois. AbbVie became an independent entity on January 1, 2013. AndroGel, while initially developed, marketed, and sold by Solvay and later Abbott Products, is now marketed and sold by AbbVie. Defendant AbbVie conducts extensive business in the United States, including in the State of Illinois. At all times relevant, AbbVie was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, the prescription testosterone replacement therapy drugs sold under the name AndroGel throughout the United States, including in the State of Illinois.

19. Defendant Abbott Laboratories ("Abbott") is an Illinois corporation with its principal place of business in Abbott Park, Illinois. Prior to 2013, Abbott engaged in the global business of development, manufacturing, marketing and sale of prescription drugs and related products. At the end of 2012, Abbott separated into two companies, one focused on the development and sale of medical products (Abbott), and the other focused on the development and sale of research-based pharmaceuticals (AbbVie). Defendant Abbott conducts extensive

business in the United States, including in the State of Illinois. At all times relevant, Abbott was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, the prescription testosterone replacement therapy drugs sold under the name AndroGel throughout the United States, including in the State of Illinois.

20.     Collectively, Solvay S.A., Solvay America, Inc. Solvay Pharmaceuticals, Inc., Unimed Pharmaceuticals, LLC, Besins Inc., Besins S.A., Abbott Products, Inc., AbbVie Inc. and Abbott shall be referred to herein as "the AbbVie Defendants." The AbbVie Defendants are sued herein in connection with their TRT product, AndroGel.

21.     Defendant Auxilium Pharmaceuticals, Inc. ("Auxilium") is a Delaware corporation which has its principal place of business at 640 Lee Road, Chesterbrook, Pennsylvania 19087. Auxilium has conducted business and derived substantial revenue from sales of Testim and Testopel throughout the United States, including in the State of Illinois. At all times relevant, Auxilium was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, the prescription testosterone replacement therapy drugs sold under the names Testim and Testopel throughout the United States, including the State of Illinois.

22.     Defendant GlaxoSmithKline LLC ("GSK") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at the Philadelphia Navy Yard, 5 Crescent Drive, Philadelphia, Pennsylvania 19112. GSK is a wholly-owned subsidiary of GlaxoSmithKline plc, a British public limited company that is registered to do business in the United States. As described in detail below, during relevant times, GSK was a co-promoter, with Auxilium, of Testim.

23.     Defendant Oscient Pharmaceuticals Corp. ("Oscient") is a corporation organized and existing under the laws of Massachusetts and has its principal place of business at 1000 Winter Street, Suite 2200, Waltham, MA 02451.  As described in detail below, during relevant times, Oscient was a co-promoter, with Auxilium, of Testim.

24.     Defendant Endo Pharmaceuticals, Inc. ("Endo") is a corporation organized and existing under the laws of Delaware with its principal place of business at 100 Endo Boulevard, Chadds Ford, Pennsylvania 19317.  On or about January 29, 2015, Endo (directly or indirectly) acquired Auxilium.  Auxilium owned, manufactured, marketed, and sold several TRT products, including Testim and Testopel.  In acquiring Auxilium, Endo assumed all liabilities arising from those products.

25.     Endo is sued herein in connection with the products it acquired from Auxilium, namely Testim and Testopel. To the extent that any of Auxilium's liabilities were not assumed, and to the extent that Auxilium continues to exist, Auxilium is sued herein in connection with Testim and Testopel.

26.     At all times alleged herein, Defendants include and included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

27.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessors in interest, and joint venturer of each of the remaining Defendants herein and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership, and joint venture.

28.     At all times relevant, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into

interstate commerce throughout the United States, either directly or indirectly through third parties, subsidiaries or related entities, the TRT drugs.

### III.    JURISDICTION AND VENUE

29.    This Court has jurisdiction over this matter under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed class exceeds $5,000,000, and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.  Jurisdiction also rests under 28 U.S.C. § 1331 because claims in this action arise under the laws of the United States.

30.    This Court has personal jurisdiction over Plaintiff because Plaintiff's principle place of business is within this District.  This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in this District, and some of the actions giving rise to the Complaint took place in this District.

31.    This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367.

32.    Venue is appropriate in this District under 28 U.S.C. §1391 because Defendants, as corporations, are deemed to reside in any judicial district in which it is subject to personal jurisdiction.  Additionally, venue is proper in this District under 18 U.S.C. §1965 because all Defendants received substantial compensation from the sales of their respective TRT drugs(s) in this District, all Defendants made misrepresentations and material omissions about their respective TRT drugs(s) in this District, and all Defendants can be found, have an agent, and/or transact their affairs in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     Expanding the TRT Drug Market

33.     Defendants schemed to conceal the fact that the vast majority of TRT drugs patients never suffered from diagnosed hypogonadism, the only condition for which TRT drugs are indicated for treatment by the FDA. Defendants' individual but complementary marketing strategies specifically targeted patients with age-appropriate testosterone levels and patients with erectile dysfunction, diabetes, depression and obesity (among other off-label promotions), many of whom were already at higher risk for cardiovascular adverse events, for off-label TRT drug use. Defendants succeeded in polluting the medical discourse and medical literature concerning testosterone therapy to such a degree that the paradigm of the entire disease state and diagnosis was distorted. In addition, Defendants ensured that Plaintiff and Class Members were kept in the dark about concerning off-label usage of TRT drugs.

34.     Testosterone therapy replacement did not begin with the approval of any of the TRT drugs referenced herein. In fact, isolated testosterone was first synthesized in 1935, and was introduced to the market shortly thereafter to treat hypogonadism. Thus, for example, TRT had been available for sixty-five years when AndroGel came to the market.

35.     In those sixty-five years, TRT was appropriately limited to only those patients suffering from a rare condition called hypogonadism, with limited utilization data to match the disease state prevalence. In 1988, sales for drugs indicated to treat hypogonadism were approximately $18 million *in toto*. In 1997, approximately 806,000 TRT drugs prescriptions were written.[1]

---

[1] *See* Gina Kolata, *Male Hormone Therapy Popular But Untested*, New York Times, August 19, 2002, http://www.nytimes.com/2002/08/19/health/19HORM.html (last checked on September 28, 2015).

36.     Coinciding with the approval of AndroGel in early 2000, and in the preceding and following years, Defendants' respective unlawful marketing schemes spawned voluminous medical literature.  This literature was sponsored by each Defendant, and much of it focused on the prevalence of hypogonadism.  What was once a rare condition was suddenly said to affect up to 40% of middle-aged men, according to respected "thought leaders" – specialist urologists and endocrinologists at teaching university hospitals – many of whom were in fact on one or more of Defendants' respective payrolls as consultants, speakers, and/or researchers.  Such studies were and are cited and re-cited *ad nauseam* by all TRT Defendants to create the impression that hypogonadism was a vastly under-diagnosed and prevalent condition.   In this manner, Defendants hoped and hope to disguise the rampant off-label prescribing of TRT drugs that resulted from their respective fraudulent promotional schemes; Defendants hoped and hope to pass their fraudulent promotion off as simply an evolution in medicine resulting in increased on-label diagnoses.

37.     These "thought leaders" were paid by Defendants to create the false impression among patients, physicians and TPPs (and the entire medical community) that almost half of the middle-aged male population in the world was hypogonadal and now needed TRT drugs.  Just how rapidly and cooperatively Defendants worked to inflate the hypogonadism prevalence numbers (a form of off-label marketing referred to as "label expansion") is exemplified by two Solvay press releases less than a year apart.  In the first, a Solvay press release dated March 2004, it was estimated that "four to five million American men are estimated to suffer from low testosterone," which was already grossly exaggerated, as discussed *infra*.  In the second press release less than a year later, Solvay asserted (relying on a yet-to-be-published Solvay-funded

study by a doctor on Solvay's payroll that was secretly ghostwritten by Solvay) that "[i]t is estimated that low T affects up to 13 million American men aged 45 and older …."

38.     Auxilium's marketing campaign, relying on the Solvay HIM Study, likewise asserted that "[u]p to 13 million men in the United States may have low testosterone, although many don't know they are affected." Auxilium later upped the ante by suggesting that "22.7 million men in this age group [50-64 year old men] suffer from low testosterone[.]"

39.     Aside from the inflation of the number of hypogonadal men increasing almost three-fold in less than a year according to Solvay and almost five-fold according to Auxilium, numerous articles soon followed relating additional benefits to using TRT drugs. Most prominent among these benefits was the assertion that TRT drugs had the potential to reverse or slow the male aging process.

40.     Defendants' respective unlawful marketing schemes directly convinced patients, physicians, and TPPs that hypogonadism was vastly under-diagnosed and undertreated, directly causing prescriptions for TRT drugs to increase 170% from 1999 to 2002. For example, sales of AndroGel alone amounted to $115.8 million (compared to only $26 million in 2000), and then skyrocketed thereafter. Plaintiff and Class Members at no point were aware that this increase was almost entirely attributable to ineffective, unsafe, and/or non-useful off-label utilization.

41.     This dramatic increase in TRT prescribing has continued through the present. In the five (5) years leading up to 2012, according to IMS Health, sales of TRT drugs grew by 90%. In its 2011 Annual Report, Defendant Abbott identified "several key initiatives" for 2012, including "maximizing the market potential" for AndroGel. The initiative was apparently successful. By 2012, sales of AndroGel alone had topped $1 billion in the United States ($1.15 billion, an increase of nearly $250 million from $874 million in sales in 2011 according to

AbbVie's 2013 Form 10-K), and sales of TRT drugs collectively had grown to about $2 billion annually. Testim's sales have increased to over $209 million per year, from $125 million in 2008. In 2011, Testim revenues accounted for nearly 80% of Defendant Auxilium's total net revenues.

42. The astronomical spike in prescriptions coincided with a proportionate increase in marketing money spent by the TRT Defendants and other TRT manufacturers. A Time Magazine cover article published August 18, 2014 regarding testosterone replacement therapy emphasized "that the low-T bandwagon will keep collecting passengers, fueled by a 2,800% increase in marketing dollars[.]" Defendant Auxilium agreed in its Form 10-K for 2013: "We believe that the increase in promotional activities has been the primary driver of the growth of the overall TRT … market[ ]." Even one of the physician participants in the AbbVie Defendants' Peer Selling Enterprise, Dr. Natan Bar-Chama (a urologist who first gained notoriety when, as a speaker for Pfizer, he suggested "preventative" daily treatment with Viagra), remarked with astonishment how successful Defendants were in expanding the testosterone market: "All of a sudden you've got these big players with a lot of money using consumer directed marketing to change the landscape ... They see the potential, they see the market growth annually and it's very impressive."

43. According to one market research company, Encuity Research, "in 2009, the top six branded [TRT] products spent approximately $55 million on promotion, but by 2013 that number had grown five-fold to just over $282 million."

44. Sales of TRT drugs are expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts.

45. While the efficacy of testosterone has long been an open question for non-hypogonadal men, many experts now believe TRT drugs are of negligible value for the marketed off-label uses. According to Dr. Brad Anawalt of the University of Washington, millions of patients are using TRT drugs off-label and with absolutely zero benefit: "For people with truly low testosterone levels, the benefits outweigh the risks … But for millions of others, it's in the same category as snake oil."[2] Very recently, the FDA's Bone, Reproductive and Urologic Drugs Advisory Committee voted 20-1 to limit testosterone prescribing, essentially rejecting the label-expanding efforts of Defendants.

46. As observed by Lisa M. Schwartz, M.D., M.S., and Steven Woloshin, M.D., M.S., in their article *Low T as a Template: How to Sell Disease* published in 173 JAMA Internal Medicine 1460-1462 (August 2013):

> Whether the campaign is motivated by a sincere desire to help men or simply by greed, we should recognize it for what it is: a mass, uncontrolled experiment that invites men to expose themselves to the harms of a treatment unlikely to fix problems that may be wholly unrelated to testosterone levels.

> …[T]here is a strong analogy between the marketing of testosterone therapy for men and estrogen therapy for menopausal women. Ignoring the lessons of estrogen therapy is scandalous. Before anyone makes millions of men aware of Low T, they should be required to do a large-scale randomized trial to demonstrate the testosterone therapy for healthy aging men does more good than harm.

47. TRT drugs makers, including the Defendants and led initially by the AbbVie Defendants, created a disease state targeted specifically at aging men with age-appropriate or borderline testosterone levels that they labeled "Andropause" (the male version of menopause). It has been well known since the 1960's that, after reaching the age of thirty, men's testosterone

---

[2] *See* Roni Caryn Rabin, *Weighing Testosterone's Benefits And Risks*, New York Times, February 3, 2014, http://well.blogs.nytimes.com/2014/02/03/weighing-testosterone-benefits-and-risks/ (last checked on September 28, 2015).

levels can be expected to decline naturally by about 1% per year. However, according to the New York Times, "[t]o the pharmaceutical industry, that [natural] decline was ripe for treatment."[3]

48.    With their respective schemes now exposed, estimates are that the vast majority of TRT drug use is for ineffective, unsafe, and/or useless off-label purposes. For once-daily TRT drugs, estimates are that such off-label use is even higher.

49.    A study published in the Journal of the American Medical Association ("JAMA") in August 2013 indicated that many men who get testosterone prescriptions have no evidence of hypogonadism. For example, one third of men prescribed testosterone had only a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription.[4]

50.    TRT drugs have not been proven to be safe or effective to treat male aging. The same is true for the host of other symptoms and conditions for which Defendants promoted TRT drugs mostly as an "add-on" therapy (*i.e.*, in conjunction with as opposed to replacing other on-label treatments). As explained by a vigorous promoter of testosterone therapy – Dr. Abraham Morgentaler (who has been paid many thousands of dollars by pharmaceutical companies with testosterone products on the market) – it can take "years, even decades, to correct a medical myth." Of course, Dr. Morgentaler was speaking of the association of testosterone and prostate cancer; however, his statement is more applicable to the marketing juggernaut Defendants have created surrounding testosterone therapy and male aging, which is only just beginning to be

---

[3] *See* Natasha Singer, *Selling that New Man Feeling*, New York Times, November 23, 2013, http://www.nytimes.com/2013/11/24/business/selling-that-new-man-feeling.html (last checked on September 28, 2015).
[4] *See* Baillargeon, J., et al., *Trends in Androgen Prescribing in the United States, 2001 to 2011*, 173 JAMA 12/26 (August 2013), http://archinte.jamanetwork.com/article.aspx?articleid=1691925&resultclick=1 (last checked September 28, 2015).

unraveled. This, combined with the recently revealed serious safety risks posed by TRT drugs, has resulted in a recent understanding that the vast majority of patients being prescribed TRT drugs should not have been using any TRT drugs at all.

### B. Defendants Knowingly Concealed the Serious Adverse Effects of Off-Label Use

51. Defendants knew of and concealed the serious adverse health effects associated with the off-label use of TRT drugs. Recent studies have demonstrated increased incidence of cardiovascular adverse events, including myocardial infarction, stroke, pulmonary embolism, and other thromboembolic adverse events. Aging men, the primary patient target for Defendants' label-expanding and off-label marketing scheme, tend to be at particular risk for such adverse events. In some patient populations, there is up to a 500% increased risk of such adverse events. As part of Defendants' illegal schemes to increase sales of their TRT drugs(s), these known safety risks were and continue to be systematically concealed and minimized from the public and from TPPs and consumers.

52. For example, none of the seven clinical trials referenced on the AndroGel Defendants' www.AndroGel.com website from 2000-2011 includes any meaningful reference to cardiovascular effects of AndroGel use. The same is true for Auxilium's www.testim.com website. This is despite reports that several TRT drugs makers have been proactively addressing cardiovascular safety issues in their promotional efforts. One physician detailed by the AbbVie Defendants on AndroGel noted that the sales rep was "[t]rying to quell concerns over cardiac risk." Until a Testim placebo-controlled study was halted in late 2009 due to cardiovascular adverse events in the Testim study group, Defendants ensured that the only cardiovascular health discussion relating to TRT drugs centered on potential (but quite obviously, unproven) cardio-

protective effects. Even after the unusual halting of the Testim study, Defendants continued and continue to proclaim the safety of TRT therapy.

53.     From 2000 until today, each Defendant has been engaged in a fraudulent and illegal scheme to cause increased prescribing and reimbursement for their drugs TRT product(s). As the entities directly reimbursing most, if not all, of the cost of TRT Drugs prescriptions, Plaintiff and Class Members were the primary and intended victims of these fraudulent schemes. Defendants' respective schemes targeted and defrauded TPPs and consumers on a massive scale. Defendants' respective fraudulent practices convinced patients they could benefit from TRT drug use, caused doctors to write prescriptions for TRT drugs that they otherwise would not have written, and caused TPPs and consumers to pay for and/or reimburse claims for prescriptions of each Defendant's drugs product that they otherwise would not have paid.

54.     Each Defendant knew that TPPs would reimburse for on-formulary prescriptions of TRT drugs, even if the drugs were being prescribed as a result of their respective covert systematic and illegal schemes to promote their TRT drugs(s) for label-expanding or off-label uses. Although TPPs have a variety of tools that can be used to manage drugs costs and promote high quality prescribing and utilization of pharmaceuticals, each Defendant knew that TPPs do not have the capability either to detect whether TRT drugs prescriptions were written for off-label indications.

55.     Consequently, TPPs included many of the TRT drugs on their formularies with few, if any, limitations, and unknowingly paid for TRT drugs prescriptions for ineffective, unsafe, and/or non-useful off-label purposes as a result of Defendants' unlawful marketing practices. At all times material hereto, each Defendant knew that, because TRT drugs are FDA approved and effective for the treatment of the limited population of patients with

hypogonadism, the products were placed without restrictions on most TPP formularies nationally.

56.     Each Defendant knew that TPPs and their PBMs would be unable to identify off-label uses of TRT drugs from the pharmacy claim transactions they receive, or to easily be able to restrict utilization to on-label uses. This is because the diagnosis for which a drug is prescribed is not required on a prescription claim submitted to TPPs. Likewise, pharmacies do not have access to diagnostic information at the time a claim is processed for payment to TPPs. As a result, a diagnosis code is not included as a component of typical claim transactions and the diagnosis is unknown to TPPs and/or their PBMs. And even in situations where TPPs did request diagnostic information (such as, for example, by requiring prior authorization or a letter of medical necessity, discussed *infra*), each Defendant's sales force actively provided such forms and instructed doctors to disguise the fact that the TRT drugs prescriptions were for off-label use.

57.     At all times material hereto, each of the Defendants was well aware of the limitations faced by TPPs and PBMs in their ability to control off-label coverage of TRT drugs. As a result of Defendants' misrepresentation and concealment of the true safety and efficacy profiles of TRT drugs, Plaintiff and Class Members were denied the opportunity to make fully informed decisions about whether and how to include TRT drugs on their formularies and/or paid for far more TRT drugs prescriptions than they otherwise would have paid absent Defendants' fraudulent and illegal TRT drug promotion schemes. Plaintiff and Class Members have been injured to the extent that they have paid for inappropriate use of TRT drugs and to the extent that Plaintiff and Class Members have paid or will pay for the health care services and facilities resulting from adverse events associated with TRT drug use.

58.     Due to Defendants' illegal marketing schemes and enterprises set forth in detail below, there resulted a flurry of fraudulent prescribing activity, which continues to this day. Plaintiff and Class Members, as a direct and natural result of each Defendant's fraudulent scheme, have been forced and will continue to be forced to reimburse millions of TRT drugs prescriptions even though it has recently become apparent that, for the vast majority of TRT drugs patients, no prescriptions should have or would have been written absent Defendants' unfair conduct and illegal enterprises.

59.     In addition to the personal injuries, deaths, and other adverse events associated with TRT drug use, which have had serious implications for men's health, the financial impact of each Defendant's false and deceptive marketing of their respective TRT drugs(s) has likewise been profound, especially for TPPs, which bear the ultimate cost of TRT drugs prescriptions. As has recently become clear, TPPs and consumers across the nation were the primary financial victims of Defendants' unlawful schemes, having been duped by each Defendant into paying billions of dollars for off-label, ineffective, and unsafe TRT drugs prescriptions.

### C.     Formation of the Peer Selling, Publication, and DTC Enterprises

60.     From approximately 2000 and continuing to the present, each Defendant implemented a marketing, advertising and promotion campaign by combining its own respective considerable personnel and financial resources with a discreet and identifiable number of medical marketing firms and peer-influencing physicians through which Defendants (i) falsely and deceptively oversold the efficacy of the TRT drugs, (ii) inadequately warn of, and intentionally misled the medical community regarding the severe side effects of the TRT drugs, and (iii) unlawfully promoted the TRT drugs for usage in populations for which it had not received FDA approval and for which the efficacy and side effects had not been established

through adequate clinical evidence. These associations-in-fact created by each Defendant can be delineated as the AndroGel and Testim Peer Selling Enterprises, the AndroGel and Testim Publication Enterprises, and the AndroGel and Testim Direct-to-Consumer Enterprises (collectively "the Enterprises"). Each Defendant and its associated participants established the respective Enterprises to accomplish the common goal of causing increased prescribing activity of the Defendant's TRT drug(s) for off-label uses for which the TRT drug(s) were not proven to be safe, effective, or useful. The schemes were accomplished through fraudulent, or false and deceptive, claims of efficacy and safety, medical usefulness, and for unlawful, off-label purposes.

### D. The Peer Selling Enterprises

61. In order to create the Peer Selling Enterprises successfully, each Defendant had to construct parallel marketing structures that appeared independent from the ordinary promotion forces in order to avoid federal regulations concerning off-label promotion and to create the illusion of independence behind the misleading messages of safety, efficacy and non-indicated usage they each wished to promote. Each Defendant targeted primarily speaking events, seminars, continuing medical education ("CME") events, or other physician gatherings. Defendants each worked with and paid vendor participants to create content for such speaking events that misrepresented the safety, efficacy, and usefulness of Defendants' TRT drug(s) for off-label uses, and then paid physician participants to serve as faculty or lecturers at such events to deliver the disguised promotional messages to unsuspecting physician attendees.

62. Defendants' respective Peer Selling Enterprises centered on each hosting numerous events where doctors trained and/or approved by Defendants would falsely oversell the efficacy and safety of TRT drugs, and the sponsoring Defendant's TRT drug(s) in particular,

and would provide favorable information on the off-label use of such TRT drug(s), often under conditions where physicians would be compensated for attending the presentation. Defendants each have funded and continue to fund scores of such events between approximately 2000 to present.

63. Because Defendants were prohibited from directly producing such events, they each created and controlled a Peer Selling Enterprise composed of medical marketing firms (the "vendor participants") and several dozen physicians (the "physician participants") who routinely promoted one or more of the TRT drugs to other physicians in venues all across the country. Defendants each maintained sufficient control over their respective Peer Selling Enterprises to select and approve the content of the programs and the physician participants that would deliver the off-label message. Physicians who were not receptive to promoting the TRT drug(s) for the off-label uses were not considered for inclusion in the respective Peer Selling Enterprises. The physicians (mostly primary care physicians) who attended these events were deceived into thinking that the events were educational in nature and independent from the control of the sponsoring Defendant(s).

64. The Peer Selling Enterprises employed improper and unlawful sales and marketing practices, including: (a) deliberately misrepresenting the safety and medical efficacy of the TRT drug(s) for a variety of off-label uses; (b) knowingly misrepresenting the existence and findings of scientific data, studies, reports and clinical trials concerning the safety and medical efficacy of the TRT drug(s) for both approved indications and for a variety of off-label uses; (c) deliberately concealing negative findings or the absence of positive findings relating to the off-label uses of the TRT drug(s); (d) wrongfully and illegally compensating physicians for causing the prescribing of the TRT drug(s); (e) knowingly publishing articles, studies and reports

misrepresenting the scientific credibility of data and touting the medical efficacy of the TRT drug(s) for both on-label and off-label uses, and then disseminating copies of such studies by the thousands; (f) intentionally misrepresenting and concealing Defendants' role and participation in the creation and sponsorship of a variety of events, articles and publications used to sell the TRT drug(s) to off-label markets; and (g) intentionally misrepresenting and concealing the financial ties between Defendants and other participants in the Enterprises.

66.     Each Defendants' scheme reaped significant financial gain.   From 2000 to present, each Defendant's revenues from the sale of their TRT drug(s) soared into the millions and billions of dollars.  Eventually, as a result of each Defendant's Peer Selling Enterprise efforts and unbeknownst to Plaintiff and Class Members, the vast majority of all TRT drug prescriptions were for off-label uses.  Sales of each drug have grown at a significant rate each year.

66.     All of the participants in the Defendants' respective Peer Selling Enterprises associated with the respective Defendants with the common purpose of aiding them in marketing that Defendant's TRT drug(s) for off-label uses and to achieve "market expansion" of these uses. Each of the participants received substantial revenue or other consideration from each Defendant for their efforts in the scheme to promote the TRT drug(s) off-label.  The more successful these marketing events were, the more events there would be in the future and the more fees each of the participants would receive for participating in the events.  For these reasons, all of the participants knowingly and willingly agreed to assist each of the Defendants in their off-label promotion of the TRT drug(s), notwithstanding the fact that such a promotional campaign required the systematic repetition of false and misleading statements to, and the commercial bribery (through kickbacks) of, numerous physicians throughout the United States, and that the promotion of any of the TRT drugs for off-label indications by Defendants was illegal.

67.     Each Defendant exercised control over and participated in its respective Peer Selling Enterprise.  Each Defendant compensated the other participants for their efforts, and controlled the money flow to the participating vendors and physicians.  Defendants each closely monitored all events to insure the expected representations and marketing messages related to the off-label uses of their respective TRT drug(s) were made to physicians attending the events.  Following such events, each Defendant tracked attending physicians' prescribing habits to ensure that the messaging was successful in causing prescribing activity for their respective TRT drug(s).

i.      *The Role of Medical Marketing Firms in Peer Selling Enterprises*

68.     Third party medical marketing firms were critical to each Defendant's scheme to promote its TRT drug(s) off-label from the scheme's inception.  Each Defendant's marketing plans called for off-label information concerning its TRT drug(s) to be widely disclosed in continuing medical education programs, "consultants' meetings" (also called "advisory boards"), and other programs where physicians could instruct other doctors how to use each Defendant's TRT drug(s) for unapproved indications.  Bona fide continuing medical education programs and similar educational events are exempt from FDA rules prohibiting off-label promotion because the sponsoring organization (which was often a nonprofit, like a medical school) was independent and was supposed to control the content of such programs.  In practice, however, these programs were produced with the assistance of third party medical marketing firms, some of whom are listed below, and these firms, acting at the direction of the sponsoring Defendant(s), supplied content and controlled the selection of presenting physicians.

69.     Each Defendant's respective and collective marketing strategies turned the proper practices for presenting continuing medical education programs on their head.  Instead of

accredited institutions planning independent programs and then approaching third party vendors and financial sponsors, each Defendant intended to create turnkey medical programs, with financing already included, and then find "independent" institutions that would present the package in the format each Defendant and its Enterprise created.

70.     Among the information each Defendant, the participating vendors, and the participating physicians deliberately omitted from the events they sponsored was the following: (a) the complete lack of adequate clinical trial evidence to support the off-label uses of TRT drugs; (b) negative clinical trial results that demonstrated TRT drugs were no more effective than other, less costly, medications; (c) suppression negative evidence that TRT drugs did not work for off-label conditions; (d) information that virtually all publications and studies that allegedly supported the off-label use of TRT drugs had been funded by one or more Defendant(s); (e) information that virtually all publications and studies that allegedly supported the off-label use of TRT drugs had been initiated by one or more Defendant(s) pursuant to a corporate marketing plan designed to increase off-label sales; (f) information that the participating doctors who were conducting the peer selling had been paid substantial subsidies to use Defendants' TRT drugs on their patients for off-label purposes; (g) that the events the physicians were attending were neither fair nor balanced and were created to insure the physicians would not hear a fair and balanced examination of TRT drugs for off-label uses; (h) information that the events were not funded, as advertised, by an "unrestricted" grant from each Defendant, but that the grants were conditioned upon the participating vendors and sponsoring institutions putting on presentations that painted the off-label use of TRT drugs in the most favorable light; and (i) information with respect to dangerous side effects revealed through each Defendant's internal research, adverse event reports, and independent research.

71.     Each of the participating vendors was in regular communication with the respective Defendant(s).  In connection with major medical congresses or conventions of the specialists that were the target of the off-label promotion campaign, the participating vendors coordinated their events to ensure their off-label message reached the most physicians in the most effective manner.  The participating vendors were also in regular communication with many of the participating physicians, and individual participating physicians gave the same presentation (or a substantially equivalent presentation) at different participating vendors' events, per each sponsoring Defendant's directions.

72.     The planning and coordination of all of these events by the third party medical marketing firms required extensive use of the wires and mails, including the mailing of invitations to physicians, the mailing of proposals to the accrediting institutions, booking of hotels and airplane tickets, the arrangement of meals, the scheduling of teleconference calls, the development and modification of the tactical plans, and the coordination of the content of the presentations on TRT drugs to be presented at the event.

73.     Firms that participated in the Peer Selling Enterprise include co-promoters, third party advertisers, proliferation firms and outside consultants such as: Dowden Health Media (110 Summit Ave., Montvale, NJ 07645); Edelman Worldwide (250 Hudson Street, 16th Floor, New York, NY 10013), etc.  Plaintiff at this time does not know the identities of all the vendor participants involved in respective Peer Selling Enterprises.

### ii.     *The Role of Physicians in the Peer Selling Enterprises*

74.     One of the principal strategies pursued by all Defendants in their respective Peer Selling Enterprises was to target key physicians to serve as "thought leaders." These doctors promoted the assigned TRT drug(s) to their peers through peer selling programs by (i) touting

that TRT drug's supposed off-label uses; (ii) claiming that TRT drugs were being widely used by other physicians for off-label uses; and (iii) claiming that they were privy to the latest clinical data that had not been released yet, but which would support off-label use.

75.     To lure physicians to participate in the Peer Selling Enterprises, each Defendant approached target doctors and informed them of an interest in funding research opportunities and clinical trials at their institutions.  Doctors who were willing to speak favorably about one or more TRT drugs could receive substantial funds in the form of research grants or other monies. In addition, these doctors were frequently remunerated for other less-defined services, including "consulting" and "advisory board" services.  Each Defendant instructed its sales departments to select doctors at the major teaching hospitals to become TRT drug "experts" or opinion and thought leaders ("OTLs") who would in turn deliver the TRT message to other physicians to grow sales.  This was done formally to other physicians at marketing events or informally to colleagues within a hospital or medical practice, or at a dinner or lunch roundtable.

76.     Having recruited these physicians, each Defendant's Peer Selling Enterprise created an explosion in the off-label use of TRT drugs by artificially creating the perception that physician specialists were clinically using TRT drugs and investigating with positive results their efficacy in off-label uses on their own initiative, and not as a result of the illegal marketing activities and inducements.  Each Defendant developed a stable of physicians to create this perception.  Each Defendant, principally through the vendor participants to minimize reportable conflicts of interest, paid these physicians to induce them to write journal articles and letters to the editor that favorably discussed the off-label use of TRT drugs.  Each Defendant also paid these physicians (in addition to providing free travel to resorts, free lodging and free meals) to induce them to give talks at medical education seminars, advisory boards, consultants' meetings,

speakers bureaus and similar events where the primary focus of the discussion was the off-label use of TRT drugs. The physicians who accepted these benefits and agreed to promote one or more TRT drugs off-label to other doctors were physician participants in the respective Defendant's Peer Selling Enterprise(s). The individual physician participants received tens of thousands of dollars, and in some cases hundreds of thousands, to promote the off-label uses of TRT drug(s). Participation in the Enterprises through sham "authorships" and serving as presenting "faculty" at CME events and other honoraria also enhanced the physician participants' professional reputations.

77.     The returns on investment ("ROI") in each Defendant's Peer Selling Enterprise were highly favorable. For example, the AbbVie Defendants made the following internal remarks regarding Dr. Ramon Perez's efforts to promote AndroGel off-label: "Dr. Ramon Perez is the most recognized OTL [opinion and thought leader] in the Region. He participated in numerous dinner programs and also was appointed by the AndroGel® Brand Team to develop a National Marketing Program – 'Perez Audio Conference'. He definitely had an impact on the Region's 2003 success."

78.     There was another teleconference program by Dr. Adrian Dobs, Professor of Medicine at John Hopkins, whom the AbbVie Defendants also paid to deliver off-label marketing messages concerning AndroGel that was similar to the Perez Audio Conference. Dr. Dobs received over $15,000 from the AbbVie Defendants in the months of August through November 2013 alone for "Travel and Lodging" and for "Compensation for services other than consulting, including serving as faculty or as a speaker at a venue other than a continuing education program." In other words, under-the-radar payments to Dr. Dobs's for her Peer

Selling CME lectures funneled by the AbbVie Defendants through its vendor participants are not included.

79.     Physician participants were absolutely critical to the success of each Defendant's Peer Selling Enterprise.  Indeed, the marketing plans drafted by each Defendant and its vendor participants required their participation.  The participation of physicians allowed each Defendant and the vendor participants to disguise promotional events as educational events or consultants' meetings.  Moreover, as noted above, each Defendant and the vendor participants knew that peer-to-peer selling was far more persuasive than traditional drug rep detailing.  Primary care physicians are more likely to follow the advice of a Professor of Medicine at Johns Hopkins or another teaching hospital than that of a sales rep.  By funneling the payments to the physician participants through the vendor participants, the Peer Selling Enterprises could hide the speakers' financial ties with each Defendant, and the Enterprises were able to mislead physician-listeners into believing that the speakers were not biased and that the events were not promotional.  As a result, the vast amounts of money the participating physicians received from one or more of the Defendants, for speaking and other purposes, was largely hidden from the physicians who attended events at which the participating physicians spoke.

80.     Physicians who participated in the Peer Selling Enterprise(s), either as speakers or as authors, entered into mutually advantageous contractual relationships with the Defendant(s). The more favorable a physician's statements were, the more he or she could expect to receive in the form of speaker fees, consulting fees, advisory board fees, and research grants. Physicians who refused to deliver the favorable off-label messages that each Defendant wanted were blackballed and would not receive additional payments.

81.     The participating physicians knew that minimal scientific evidence supported the use of TRT drugs for the off-label uses and that the type of clinical evidence that existed was insufficient, under the accepted standards in the medical profession, to represent that TRT drugs worked for the unapproved indications.

82.     Physician participants worked with, and were retained by, multiple vendor participants.  All of the physician participants also had personal relationships with employees of each Defendant, and frequently each Defendant recommended specific individual participants for events.

83.     The Defendants' respective Peer Selling Enterprises each sponsored hundreds of events across the country between 2000 and the present.  The Plaintiff and Class Members have only had an opportunity to review the records of a small subgroup of these events.  Based on the records reviewed to date, dozens of physician participants received $25,000 or more for participating in the Peer Selling Enterprise activities of one or more TRT drugs for the time period indicated below (not counting travel, food, lodging and entertainment benefits they received for events held at resorts or out of town hotels).

84.     In order to implement their respective plans to transform their TRT drug(s) into blockbuster drugs despite a small on-label patient population, each Defendant created separate Peer Selling Enterprises composed of each Defendant, co-promoting firms including those listed above, numerous medical marketing vendors, research institutions and physician societies, and dozens of physician participants, some of whom are listed above and others whose identities will be revealed in discovery.  These participants all acted together and under each Defendant's control in promoting the Defendants' respective TRT drug(s) off-label to the healthcare industry, employing numerous tactics with an enormous degree of success.

85. Each Defendant, co-promoters, and the medical marketing firms hosted numerous seminars and events over the course of several years that were falsely represented to be neutral, educational forums. At these events, the roster of physician participants provided misleading and deceptive information to fellow physicians on the off-label uses of TRT drugs(s) (i.e., peerto-peer marketing). The physician participants were not independent, but received behind-the-scenes coaching and remuneration from each Defendant and/or its vendors, and often used slide decks and PowerPoint presentations prepared by the marketing teams of each Defendant. Targeted audience members, many of whom were primary care physicians, were not aware that the specialists (including prominent urologists and endocrinologists) speaking to them were in fact delivering, and being paid to deliver, the off-label marketing messages of each Defendant.

86. In addition, the sales force of each Defendant (and of the co-promoting pharmaceutical companies) promoted the Defendant's TRT drug(s) to physicians through "details" or sales calls to physicians' offices. On these sales calls, sales representatives – often using a sales aid and/or sales script developed by each Defendant's marketing team in conjunction with medical marketing vendors – "detail" the physician on the off-label uses of the Defendant's TRT drug(s). In addition, the sales representatives were instructed to deliver to physicians reprints of medical journal articles advocating the off-label use of the Defendant's TRT drug(s), many of which were created pursuant to the Publication Enterprises, and to notify physicians of and ask for their attendance at upcoming CME events and lectures sponsored by Defendants pursuant to the Peer Selling Enterprise. All aspects of each Defendant's Peer Selling Enterprise were mutually reinforcing.

87. Having already caused an increase in prescribing through the fraudulent and illegal marketing efforts, the sales force of each Defendant then engaged Pharmacy &

Therapeutic Committees (hereinafter "P&T Committees") and PBMs, and delivered the same false and misleading sales pitches to encourage favorable formulary placements for their TRT drug(s). Once those formulary placements were obtained, each Defendant attempted to "pull through" on the placements by encouraging use of its TRT drug(s) among that particular payor's members.

88. All components of each Defendant's Peer Selling Enterprise were fully integrated and operated under each Defendant's exclusive control.

### E.    Formation of the Illegal Publication Enterprises

89. Second, to execute their Publication Enterprises successfully, each Defendant had to generate and publish favorable study results (negative study results were sequestered) and articles that appeared to emanate from independent physicians. Defendants proceeded by designing studies with predetermined results that consistently focused almost exclusively on off-label uses of TRT drugs. Adequately powered safety studies for such off-label uses were deliberately avoided. Each Defendant maintained exclusive control over the study protocols, the selection of investigators and/or external authors, and the study results. Investigators were required to sign non-disclosure agreements, such that Defendants maintained exclusive control over which study results were made public. Assuming a particular study yielded positive results, each Defendant then retained one or more medical communications vendors to ghostwrite a publication with the assistance of Defendant's employees. Undue importance was given to injecting promotional messaging into such articles. Finally, the articles were published as unbiased scientific literature under the names of the external authors/investigators; such authors were paid to lend their names and reputations for a fee. Finally, each Defendant ordered reprints of such studies by the thousands, and each Defendant's sales force was instructed to deliver

reprints to physicians on sales calls, while not disclosing the process by which these publications were generated. These studies were designed to give the appearance of independent peer-to-peer credibility for study results that were cherry-picked and for articles that were designed much the same as a sales aid.

90.     In order to execute their respective publication strategies, each Defendant also needed to generate favorable articles about not only the off-label uses of their respective TRT drug(s), but also to expand the definition of hypogonadism to support the blockbuster sales each Defendant hoped to achieve. However, each Defendant's apparent control of this strategy had to be kept to an absolute minimum. Articles had to appear as if they emanated from independent physicians who were investigating each Defendant's TRT drug(s) independently. To perform these tasks each Defendant established a Publication Enterprise, which created "independent" publications. Each of the Defendant's Publication Enterprises was an association in fact of medical marketing companies, participating physicians and each Defendant, for the purpose of promoting off-label uses of the Defendant's TRT drug(s).

91.     Each Defendant's publication strategy required publications from independent physicians when in fact no such publications existed. To effectuate the strategy, each Defendant designed study protocols that had the highest chances of generating favorable results for the off-label use of their TRT drug(s). Sufficiently powered studies assessing the safety and tolerability of TRT drugs were avoided, as conceded by Dr. Peter J. Snyder, lead investigator of the Testosterone Trial, a series of seven trials to assess the effects of TRT among elderly men. Even though one of the Testosterone Trial studies was supposed to have assessed cardiovascular risk, Dr. Snyder himself conceded it was "nowhere near large enough to determine any important risk. Not prostate cancer, not heart disease." Instead, Dr. Snyder ruefully explained that the most

important function of the studies was the spin that would inevitably be placed upon the results by the TRT manufacturers. The Testosterone Trial is financially underwritten by the AbbVie Defendants.

92. Maintaining absolute control over the respective Publication Enterprises, each Defendant (usually through an internal "Publication Strategy Team" or similar group) handpicked specialists to be the study "investigators," but these specialists have little input in the study design and which study results could be released to the public. Each Defendant, as part of the Publication Enterprise, then hired non-physician technical writers and vendor participants and used internal employees to create the necessary articles and then paid the specialists to be the articles' purported "authors." This practice is referred to as "ghostwriting." In order to monitor the status of publications, and in order to coordinate and execute the ghostwriting plan, marketing firms were necessary. The role played by the firms in assisting each Defendant in creating publications was very similar to the role played by marketing firms in the coordination of peer-to-peer marketing events, and are vendor participants.

93. Feeding into the Peer Selling Enterprise, once the favorable articles were published, each Defendant distributed so-called "reprints" of these publications by the thousands and required its Peer Enterprise physician participants to discuss these study results at peer influence events as part of the publication strategy, and intentionally misrepresented or fraudulently omitted each Defendant's role in the creation and sponsorship of the publications. Physicians who reviewed these publications were led to believe that the publications were the result of independent, unbiased research of the authors of the articles. They were not made aware of the fact that each Defendant had in fact solicited these articles, that they had paid significant sums of money in various forms to the physician authors to induce them to make

favorable statements about Defendants' TRT drugs, and that they had controlled the published content of these articles.

94.     Even in cases in which physician-authors drafted the articles themselves, they did so under the same system of direction and control through which each Defendant controlled speaker content.  Physicians were promised grants and other gifts if they wrote favorable articles. If a physician attempted to write a negative article, each Defendant would attempt to intervene and have a more favorable draft written.  If this failed, each Defendant would do its best to suppress the article or restrict its dissemination.  As part of the recruitment process of study "authors" and "investigators," such participating physicians were usually required to sign agreements restricting their ability to discuss the studies or their results.  Defendants used these agreements to filter potentially negative study results from entering the medical discourse concerning their TRT drugs.

95.     Some physicians participated in the Publication Enterprises by publishing favorable journal articles and letters to the editor about off-label use of the TRT drug(s).  Each Defendant paid large sums of money, often in the form of research grants, to the physician participants in order to publish such articles.

96.     In some cases, the participating physicians were not required to perform any research or even write the article.  Marketing firms who were financed by a Defendant or internal employees of a Defendant ghostwrote articles under the physician participants' names. Physicians merely had to "lend" their names to the articles, in exchange for a payment, which was usually made by the vendor participant so as to minimize reportable conflicts that might otherwise be disclosed at the end of the resulting article.  Authorship on such articles also enhanced the professional reputations of participating physicians.

97. The final method by which a Defendant controlled the stream of published information was through a policy of publishing only favorable results of its own internal trials and suppressing results that were unfavorable. The product of this selective publishing was a corpus of data that inaccurately represented safety profiles of the TRT drugs individually and as a class. For example, Xu et al., conducted a recent meta-analysis of randomized placebo controlled clinical trials for TRT products. *See Testosterone Therapy and cardiovascular events among men: a systematic review and meta-analysis of placebo-controlled randomized trials*, 11 BMC 108 (April 2013). Aside from finding that testosterone increased the risk of cardiovascular related events by approximately 50%, discussed infra, the authors also discovered that "[t]he risk of testosterone therapy was particularly marked in trials not funded by the pharmaceutical industry."

98. Pursuant to the express terms of each Defendant's corporate decisions implementing its Publication Enterprise, all information regarding negative studies funded by each Defendant remains in the sole possession of the Defendant and/or members of the journals of national subscribership, such as the Journal of Urology or the American Journal of Medicine, when in fact they were replete with each Defendant's off-label marketing messages.

99. Physicians who participated in the Publication Enterprises, either as speakers or as authors, entered into mutually advantageous relationships with the respective Defendant. The more favorable a physician's statements were, the more he or she could expect to receive in the form of research grants. Physicians who refused to deliver the favorable off-label message that each Defendant wanted were blackballed and would not receive additional payments.

100. The participating physicians knew that minimal scientific evidence supported the use of any of the TRT drugs for the off-label uses and that the type of clinical evidence that

36

existed was insufficient, under the usual standards in the medical profession, to represent that TRT drugs worked for the unapproved indications.

101.    Physician participants worked with, and were retained by, multiple vendor participants, and were usually paid for their authorship by the vendor participants to minimize reportable conflicts.  The physician participants also had personal relationships with employees of a Defendant, and frequently the Defendant recommended specific individual participants for events.

102.    The planning and coordination of the Publication Enterprises described below required extensive use of the wires and mails, including mailing invitations to physicians, booking hotels and plane tickets, arranging meals, scheduling and participating on conference calls, and coordinating the content of TRT drug publications.

103.    All components of each Publication Enterprise were fully integrated and operated under each Defendant's exclusive control.

**F.    Formation of the Illegal DTC Enterprises**

104.    Although the FDCA prohibits off-label marketing of specific products, it does not similarly regulate marketing materials or advertisements that discuss medical conditions or disease states, generally known as "unbranded promotions."  Thus, each Defendant and other TRT manufacturers' Direct-to-Consumer (hereinafter "DTC") advertising redefined and expanded the definition of hypogonadism through unchecked and misleading print, internet, and television advertisements.

105.    With the help of their associates, each Defendant engaged in DTC advertising campaigns that fraudulently, misleadingly, and unlawfully concealed and minimized serious

health risks associated with the use of TRT drugs, and promoted the drugs as safe and effective for unapproved off-label uses lacking scientific support.

106.    Each Defendant's targeted DTC advertising was designed to drive patients to ask their physicians for prescriptions for TRT drugs.  Prescribing physicians were thus being told to prescribe TRT drugs by a Defendant, by their peers, by respected thought leaders, and by their patients who were exposed to each Defendant's DTC advertising.

107.    Ad campaigns on television, print, and the internet urging men age 45 and over to get screened for low testosterone and consider long-term TRT are everywhere.  The ads use macho imagery: cars, sports, powerboats, construction, and racing prominently.  Untreated men look moderately overweight in many ads, while treated men appear fit and trim.  Some of the information on testosterone replacement on the web targets men with high cholesterol, diabetes, COPD, and asthma, suggesting that testosterone replacement therapy could reverse low libido, a bummed mood, and low energy in men age 45 and over. The catch-phrase "is it low T?" is ubiquitous in the AbbVie Defendants' materials.

108.    Third party medical marketing firms were critical to Defendants' respective DTC schemes to promote their TRT drugs off-label from the schemes' respective inceptions.  The marketing plans of each Defendant called for off-label information concerning TRT drugs to be widely disclosed directly to consumers through multiple media channels.  These programs were produced with the assistance of third party medical marketing firms, some of which are listed above. Under the direction and control of the Defendant, these firms supplied content and controlled the production of the DTC programs.

109.    Among the information each Defendant, the participating vendors and the participating physicians deliberately omitted from the DTC events they sponsored was the

following: the complete lack of adequate clinical trial evidence to support TRT drugs' off-label uses; negative clinical trial results that demonstrated that TRT drugs were no more effective than other, less costly, medications; negative evidence that TRT drugs did not work for off-label conditions; information that virtually all publications and studies that allegedly supported TRT drugs' off-label use had been funded by each Defendant, respectively; information that virtually all publications and studies that allegedly supported TRT drugs' off label use had been initiated by each Defendant pursuant to a corporate marketing plan designed to increase off-label sales; information that the participating doctors who were conducting the DTC programs had been paid substantial subsidies to use TRT drugs on their patients for off-label purposes; that the DTC events were neither fair nor balanced and were created to insure the consumers would not hear a fair and balanced examination of TRT drugs for off-label uses; information that the events were not funded, as advertised, by an "unrestricted" grant from each Defendant, respectively, but that the grants were conditioned upon the participating vendors and sponsoring institutions putting on presentations that painted the off-label use of TRT drugs in the most favorable light; and information with respect to dangerous side effects revealed through each Defendant's internal research, adverse event reports, and independent research.

110. Each of the participating vendors was in regular communication with the Defendant. In connection with DTC promotion, the participating vendors coordinated their events to ensure their off-label messages reached the most consumers in the most effective manner.

111. The planning and coordination of all of these events by each Defendant and third party medical marketing firms required extensive use of the wires and mails, including the mailing of information to consumers, airing of commercials on television and/or radio, booking

of hotels and airplane tickets, the arrangement of meals, the scheduling of teleconference calls, the development and modification of the tactical plans, and the coordination of the content of the presentations on TRT to be presented at the event.

112.    In June 2011, an ad (paid for by Abbott) appeared concerning an event held in New York City's Times Square.  The event featured a young race car driver, a race car, and old vintage cars.  The ad stated that the race car driver had his testosterone checked, that it was fine, and he was relieved.  The clear message was that, if you maintain a high testosterone level, you can still drive fast cars and perform like you did 20 to 40 years ago.

113.    One 2011 television ad showed a robust man slamming a laptop shut, walking across the screen, with the bold message: "Stop living life in the shadows." An ad in the Boston Globe shows a healthy looking man in his forties, reading: "Has he lost that loving feeling? He may have low testosterone (lowT)." Frequently men are shown with their female partners. The men look distracted and disinterested in sex.

114.    In May 2011, the publication Pharmaceutical Executive gave Heartbeat and Auxilium Pharmaceuticals (Testim) top billing for "rich media ads that helped dispel common misunderstandings of low testosterone symptoms and increase awareness of the condition and its treatment, while keeping a sense of humor about the potentially sensitive medical issue." The unbranded ads were accompanied by the www.lowtfacts.com website and directed users to additional information on symptoms and treatment.

115.    Some low testosterone awareness ads on the internet had links to the American Diabetes Association ("ADA"), implying that ADA must have espoused the point of view that diabetes is associated with low libido, low energy, and low testosterone; hence, screening for low testosterone in men with diabetes is sensible and safe.  However, such links have since been

removed, perhaps because the implication that the ADA has guidelines on testosterone screening for men with diabetes was misleading.

116.    In or about 2009, Solvay deployed a multi-channel fraudulent DTC print and television low testosterone campaign with the platform www.IsItLowT.com. The 30-second Dr. Adriane Fugh-Berman has been outspoken in the criticism of Low T DTC advertising.   In September 2013 in a Chicago Tribune editorial, Dr. Fugh-Berman and PharmedOut project manager Nicole Dubowitz explained how vague suggestions of a loss of manliness have turned into billion dollar sales for testosterone drug peddlers.  They explain that through questionnaires on sites like Auxilium's IsItLowT.com and the AbbVie Defendants' DriveForFive.com, it is hard for any man not to determine he must be suffering from low testosterone.   While the commercials often claim "it is a number," suggesting a definitive level of testosterone that indicates whether you have low T or you do not, it is simply not that straightforward.   As the editorial notes:

> The symptoms are so common and vague, it's a rare person who would avoid self-diagnosing Low T after taking the quiz at  IsItLowT.com. The site is sponsored by AbbVie (formerly part of Abbott Laboratories), manufacturer of best-selling testosterone treatment AndroGel.  If you're bored, stressed or aging normally, you probably have Low T symptoms: grumpiness, less energy, lower libido and 'falling asleep after dinner.' Even if you feel fine, you may still qualify for treatment. AbbVie's other website, DriveForFive.com, describes five risks to men's health: high cholesterol, high blood pressure, high blood sugar, high PSA levels and — can you guess — low testosterone.

117.    In 2010, the Endocrine Society warned that such self-reporting quizzes show little indication of providing useful evidence of a problem. Testosterone treatments were only approved by the FDA for confirmed testosterone deficiency seen in conjunction with an associated medical condition, such as failure of the testicles to produce testosterone due to genetic problems or chemotherapy.

118.    This has not stopped each Defendant from inundating men in the U.S. with DTC commercials showing fit men with graying hair (colloquially known as "silver foxes") lifting heavy objects, jogging down country roads, or making eyes at their (typically much younger) wives.  The tactics have worked.  Each Defendant's disease mongering increased testosterone prescriptions by a factor of five between 2002 and the present.  Defendants themselves openly discuss the success of their DTC programs.  As stated by one market research firm, "The ramp-up of [TRT drug] promotional activity is clearly having its desired effect.  According to Encuity's TreatmentAnswers™ audit, over the course of the last five years, the TRT market has seen dramatic growth in patient visits, up 55% from 1.2 million in 2009 to 1.9 million in 2013." The vast majority of these patients were likely exposed to Defendants' DTC advertising prior to visiting their physician.

119.    Unfortunately, amid this drive to generate blockbuster medications to improve their bottom lines, each Defendant has failed to provide adequate warnings about the heart risks associated with TRT drugs.

120.    All components of each Defendant's DTC Enterprise were fully integrated and operated under each Defendant's exclusive control.

### G.    Harm to Plaintiff and the Class

121.    The Defendants' respective Enterprises were designed to cause, and did cause, Plaintiff and Class Members to pay for TRT prescriptions to treat conditions for which the drugs are not FDA approved and for which there was no reliable scientific evidence that they were effective.  On top of this, there was reliable evidence that TRT drugs are not safe when prescribed off-label, and Defendants concealed this information from the public and from TPPs to prevent TPPs from discovering the causes of action asserted herein.  Patients, including those

whose prescription drug charges were paid by Class Members, and who were prescribed TRT drugs for off-label uses, received no therapeutic benefit and were subject to life threatening side effects. Absent Defendants' conduct, Plaintiff and members of the Class would not have paid for such TRT prescriptions and would not have paid for any substitute product.

122. Plaintiff and members of the Class who paid all or a portion of the cost of TRT drugs including but not limited to AndroGel and Testim, both of which were marketed by the AbbVie Defendants, Defendant Auxilium, Defendant GSK, Defendant Endo, respectively, were harmed. For example, a one-month supply of AndroGel 1.62% sells for approximately $521.59[5]. Consumers either paid for the drug completely out of pocket or paid their co-pay. The typical TPP co-payment ranges from 70% to 80% of the total cost of the drug depending on the members' prescription co-pay plan. Prior to the Defendants' TRT drugs hitting the market, the most prevalent TRT drug had been generic testosterone cypionate injections, which has a typical retail price for a one-month prescription of approximately $37[6] of which the typical TPP co-payment represents a much lower cost based on the members' co-pay plan. Plaintiff has paid and/or provided reimbursement for some or the entire purchase price for Defendants' TRT drugs over other readily available, safer, and less costly drugs such as testosterone cypionate injections. As a result of the fraudulent and/or misleading conduct of Defendants as alleged herein, consumers and TPPs have paid for Defendants' TRT drugs in greater quantities and at higher prices than they would have but for Defendants' misconduct. See the table below for a survey of TRT drug prices:

| Brand Name Drug | Quantity | Price (on October 2, 2015) |
|---|---|---|
| ANDROGEL GEL 1.62% | 30 days | $521.59 |
| TESTIM GEL 1%(50MG) | 30 days | $21.90 |

[5] https://www.rxpricequotes.com/ (last visited on October 2, 2015).

[6] *Id.*

43

| TESTOPEL MIS PELLETS | 30 days | $2,894.69 |
| AXIRON SOL 30MG/ACT | 30 days | $522.10 |
| ANDRODERM DIS 4MG/24HR | 30 days | $480.44 |
| FORTESTA GEL 10MG/ACT | 30 days | $456.16[7] |

123.    Defendants' deceptive and misleading marketing scheme increased the number of prescriptions of TRT drugs written and filled during the Class Period.  Because Defendants withheld material information about the true safety and efficacy of TRT drugs, the prescribing physicians did not have the knowledge necessary to make informed decisions regarding TRT prescriptions.  Plaintiff and members of the Class, unaware of Defendants' scheme, paid for these prescriptions.  Although more effective, safer, and less expensive alternatives are available, Defendants' promotion and marketing of TRT safety and effectiveness has been highly successful, resulting in Defendants receiving billions of dollars in profits, representing ill-gotten gains to which Defendants were not entitled.

124.    Plaintiff and members of the Class bear the ultimate responsibility of paying for their TRT prescriptions.

125.    By polluting the medical discourse and literature on hypogonandism, Defendants distorted the entire disease state and diagnosis causing Plaintiff and Class Members to pay for TRT drugs, which are neither safer nor more effective than other less expensive drugs.

126.    By directly and falsely promoting TRT drugs as safe and effective for numerous off-label conditions, Defendants influenced PBMs to place TRT drugs on their formularies and at a higher preference on those formularies.

127.    Defendants falsely promoted TRT drugs as safe and effective directly to PBMs in order to get TRT drugs placed more favorably on the PBM formularies.

---

[7] *Id.*

128.    Patients, physicians, PBMs, pharmacy and therapeutic (P&T) committees, and TPPs relied on the Defendants' misrepresentations of TRT safety. Physicians relied on the Defendants' misrepresentations of TRT safety in prescribing the drug for their patients.  PBMs and P&T committees relied on the Defendants' misrepresentations of TRT safety when approving and/or placing TRT drugs on formularies. TPPs relied on the Defendants' misrepresentations of TRT safety in reimbursing and/or paying for prescriptions of TRT drugs for their members.

129.    Therefore, Defendants' failure to adequately inform consumers, TPPs and those in the medical community that the use of TRT drugs dangerously increases the risk of cardiovascular adverse events, and their false and misleading promotion of TRT drugs' efficacy over competing less expensive drugs, caused Plaintiff and members of the Class to pay for TRT drugs, which are neither safer nor more effective than other less expensive drugs.

130.    But for Defendants' actions, Plaintiff and members of the Class would not have paid for TRT drugs but would instead have paid for safer, equally efficacious drugs or for no drug at all.

## V.    CLASS ACTION ALLEGATIONS

131.    Plaintiff brings this action on behalf of itself and, under Fed. R. Civ. P. 23(a) and 23(b)(3) as a representative of the proposed Class defined as follows:

> "All persons or entities in the United States and its territories (other than governmental entities), who purchased, paid, and/or reimbursed, in whole or in part, for the drugs AndroGel from February 28, 2000 up to the present day and/or Testim from October 31, 2002 up to the present day for purposes other than resale since their respective approval dates (the "Class Period")."

132.    The following persons or entities are excluded from the proposed Class:

a.    Defendants and their officers, directors, management, employees, subsidiaries, or affiliates;

b.    All persons or entities who purchased TRT drugs for directly from Defendants or their affiliates;

c.    All federal or state governmental entities;

d.    Any co-conspirators; and

e.    The judges in this case and any members of their immediate families.

133.    The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the prerequisites of numerosity, commonality, typicality, and adequacy.

134.    Numerosity – Federal Rule of Civil Procedure 23(a)(1).  Members of the Class are so numerous that joinder is impracticable.  Plaintiff believes the Class includes thousands of consumers and third-party payors.

135.    Commonality – Federal Rule of Civil Procedure 23(a)(2).  Questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.  Specifically, Defendants' misconduct was directed at all members of the Class, their members, their PBMs, and respective prescribing physicians.  Thus, all members of the Class have common questions of fact and law, *i.e.*, whether Defendants engaged in a comprehensive program and well-orchestrated scheme of deceptive and misleading marketing in promoting the use of TRT drugs.  This and other common questions of law and fact include, but are not limited to:

a.    Whether Plaintiff and members of the Class paid more for TRT drugs than for other equally or more effective drugs that were available at a cheaper price;

b.    Whether Defendants engaged in a conspiracy to promote the sale of and suppress adverse information about TRT drugs;

c.    Whether, in marketing and selling TRT drugs, Defendants failed to disclose the dangers and health risks of ingesting the drugs;

d.    Whether Defendants failed to warn persons who took TRT drugs of severe and permanent injuries, including cardiovascular adverse events such as myocardial infarction, stroke, and pulmonary embolism;

e.    Whether Defendants misrepresented in their advertisements, promotional materials and other materials, among other things, the safety and lack of dangers and health risks of TRT drugs;

f.    Whether Defendants knew or should have known that the ingestion of TRT drugs leads to serious adverse health events;

g.    Whether Defendants manufactured, marketed, distributed, and sold TRT drugs notwithstanding their knowledge of the drugs' dangerous nature;

h.    Whether Defendants knowingly omitted, suppressed and/or concealed material facts about the unsafe and defective nature of TRT drugs from government regulators, healthcare professionals, third-party payors, the medical community and/or the consuming public;

i.    Whether Defendants engaged in misleading and/or deceptive scheme of improperly marketing and selling TRT drugs for treatment of indications for which the drug were not lawfully approved;

j.     Whether Defendants engaged in a pattern or practice that directly caused Plaintiff and members of the Class to pay for TRT drug prescriptions that were non-medically necessary uses;

k.     Whether Defendants engaged in deceptive and/or misleading activity that directly caused Plaintiff and members of the Class to pay for TRT drug prescriptions that were for non-FDA approved uses;

l.     Whether Defendants engaged in deceptive and/or misleading activity that directly caused Plaintiff and members of the Class to pay more for TRT drug prescriptions than for other efficacious drugs that were available at a cheaper price;

m.     Whether Defendants engaged in deceptive and/or misleading activity with the intent to defraud Plaintiff and members of the Class;

n.     Whether Defendants are liable to Plaintiff and members of the Class for damages for conduct actionable under RICO;

o.     Whether Defendants are liable to Plaintiff and members of the Class for damages for conduct actionable under various state Consumer Protection Statutes; and

p.     Whether Defendants unjustly enriched themselves by their acts and omissions, at the expense of Plaintiff and members of the Class.

The common questions of law and fact identified above are common to the Class and predominate over questions affecting only individual members.

136.    The conduct and patterns of conduct alleged herein, relating to the AbbVie Defendants' sale and marketing of AndroGel, occurred between February 28, 2000 (the date of

AndroGel's initial approval by the FDA), and before to the extent that the AbbVie Defendants' animal and premarketing studies demonstrated cardiovascular adverse effects and the AbbVie Defendants engaged in pre-approval marketing, up to the present day.  The conduct and patterns of conduct occurred and continue to occur well after AbbVie's acquisition of Solvay.

137.    The conduct and patterns of conduct alleged herein, relating to Defendant Auxilium's sale and marketing of Testim, occurred between October 31, 2002 (the date of Testim's initial approval by the FDA), and before to the extent that Defendant Auxilium's animal and premarketing studies demonstrated cardiovascular adverse effects and engaged in pre-approval marketing, up to the present day.

138.    The conduct and patterns of conduct alleged herein, relating to the sale and marketing of TRT drugs, took place throughout the United States, the District of Columbia and Puerto Rico, as well as various other territories and foreign countries.  The actual sales and marketing activities described herein were executed principally by Defendants' sales forces and participating physicians and vendors, located all over the country.

139.    Typicality – Federal Rule of Civil Procedure 23(a)(3). Plaintiff's claims are typical of the claims of the Class because its claims arise from the same course of conduct by Defendants, *i.e.*, false, misleading, false and deceptive marketing in promoting use of TRT drugs. As a result, Plaintiff and members of the Class have been injured as a result of the Defendants' wrongful conduct described herein.

140.    Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).  Plaintiff will fairly and adequately protect and represent the interests of the Class.  The interests of the Plaintiff are coincident with, and not antagonistic to, those of the other Class Members. Plaintiff is represented by counsel with experience in the prosecution of class action litigation, and with

particular experience with pharmaceutical litigation.  Accordingly, the interests of the Class will be adequately protected and advanced.

141.    Adjudicating the claims of the members of the Class as a class action is superior to any other available methods because it allows for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitious litigation and will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that would result from prosecuting numerous individual actions.

142.    Proceeding as a class action is a superior method for fairly and efficiently adjudicating this controversy.  There are no known circumstances presenting difficulties in management that would preclude maintenance as a class action.  Furthermore, any potential difficulties in maintaining this action as a class action are greatly outweighed by the benefits of proceeding through the class mechanism – *i.e.*, providing persons and entities a method for pursuing claims that would not be practicable if pursued on an individual basis.

## VI.    CLAIMS FOR RELIEF

### COUNT I - VIOLATION OF 18 U.S.C. § 1962 (C)
### (*Peer Selling Enterprises*)

143.    Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

144.    Defendants are all "persons" within the meaning of 18 U.S.C. §1961(3) who conducted the affairs of the Peer Selling Enterprises through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

145.    The Peer Selling Enterprises are associations in fact consisting of Defendants, including their employees and agents, (ii) physician and/or physician society participants, as well

as countless other physicians and/or physician societies whose identities are not yet known but will be learned in discovery, (iii) and medical marketing vendors, including those listed in the foregoing allegations as well as numerous other vendors whose identities are not yet known but will be learned in discovery.

146.    The Peer Selling Enterprises are ongoing organizations that function as continuing units.   The Peer Selling Enterprises were created and used by the Defendants as tools to effectuate a pattern of racketeering activity.   The Defendants' "persons" are distinct from the Peer Selling Enterprises.  The Defendants, however, were aware of the essential nature and scope of these Enterprises and intended to participate in and/or conduct them.

147.    The Peer Selling Enterprises fall within the meaning of 18 U.S.C. § 1961(4) and consists of groups of "persons" associated together for the common purposes of promoting TRT drugs for off-label uses and earning profits therefrom.

148.    The Defendants have conducted and participated in the affairs of the Peer Selling Enterprises through patterns of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which include multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.  The unlawful predicate acts of racketeering activity committed, or caused to be committed, by the Defendants throughout the Class Period number in the thousands, and the Defendants committed, or caused to be committed, at least two of the predicate acts within the requisite ten (10) year period.

149.    The Peer Selling Enterprises engaged in and affected interstate commerce, because, *inter alia*, they marketed, sold, purchased, or provided TRT drugs to thousands of entities and individuals throughout the United States.

150.    The Defendants exerted control over and participated in the operation or management of the affairs of the Peer Selling Enterprises, through a variety of actions including the following:

a.    Defendants controlled the content of the messages being delivered by the Peer Selling Enterprises at each respective seminar, event and presentation, and in the publications by the vendor and physician participants, including the misinformation and false statements concerning the safety, efficacy, effectiveness, and usefulness of TRT drugs for off-label uses;

b.    Defendants and their employees and agents controlled the stream of information disseminated by the Peer Selling Enterprises concerning TRT drugs by exerting control over the communications concerning TRT drugs by participant physician medical marketing vendors;

c.    the Defendants selected and approved the physician participants to deliver the off-label messages for the TRT drugs at each seminar, speaking event, presentation, or other event where physician participants interacted with other health care providers concerning TRT drugs;

d.    the Defendants selected the participants of each such event and, more generally, selected the targets of the off-label Peer Selling Enterprises;

e.    the Defendants paid the vendor and physician participants for their participation in the Peer Selling Enterprises; and

f.    the Defendants placed their own employees and agents in positions of authority and control over the Peer Selling Enterprises.

151.    As detailed above, the Defendants' respective Peer Selling Enterprises consisted of: (i) deliberately misrepresenting, and causing others to misrepresent, the uses for which the respective TRT drug was safe and effective so that Plaintiff and the Class Members paid for these drugs to treat conditions and/or symptoms for which it was not scientifically proven to be safe, effective, and useful; (ii) presenting seminars and events misrepresenting the off-label uses for which the Defendants knew the respective TRT drugs were not proven to be scientifically safe, effective, and useful to physician attendees and other healthcare providers; (iii)

disseminating materials created pursuant to the Publication Enterprises and using those materials to misrepresent, and cause others to misrepresent, the uses for which the respective TRT drugs were safe, effective and useful; and (iv) actively concealing, and causing others to conceal, information about the safety, efficacy, and usefulness of TRT drugs to treat conditions for which they had not been approved by the FDA.

152.   The Defendants' schemes and the above described racketeering activities amounted to common courses of conduct intended to cause Plaintiff and Class Members to pay for excessive amounts of TRT drugs.  Within the respective Peer Selling Enterprises, each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and Class Members.  The Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiff's and the Class Members' property.

153.   The pattern of racketeering activities alleged herein and the Peer Selling Enterprises are separate and distinct from each other.  The Defendants engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the respective Peer Selling Enterprises.

154.   Plaintiff and Class Members have been injured in their property by reason of these violations in that they have made millions of dollars in payments for TRT drugs that they otherwise would not have made had the Defendants not engaged in their pattern of racketeering activities.  Plaintiff and Class Members suffered direct, consequential, and concrete financial loss flowing from the injury to their property by having overpaid for TRT drugs, having received a product or prescription that was worth less than what they paid for it, and thereby suffered out-

of-pocket losses. And but for the predicate acts committed or caused to be committed by the Defendants, the Plaintiff and Class Members would not have suffered their RICO injuries.

155. Plaintiff's and Class Members' injuries were directly and proximately caused by the Defendants' racketeering activity, as described above. Plaintiff's and Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Defendants' scheme; there is no difficulty posed by having to apportion damages among Class Members with different standing or different levels of injury because there are no other injured parties besides the Plaintiff and Class Members in this case, who are the parties directly injured by the Defendants' RICO violations; and there are no others, more directly injured, that could vindicate Plaintiff's and Class Members' claims.

156. By virtue of these violations of 18 U.S.C. § 1962(c), the Defendants are jointly and severally liable to Plaintiff and the Class Members for three times the damages Plaintiff and Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

## COUNT II - VIOLATION OF 18 U.S.C. § 1962 (C)
### (*Peer Publication Enterprises*)

157. Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

158. Defendants are all "persons" within the meaning of 18 U.S.C. §1961(3) who conducted the affairs of the Peer Selling Enterprises through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

159. The Publication Enterprises are associations-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) the Defendants, including their respective employees and

agents, (ii) physician and/or researcher participants (including physician societies), including those listed in the foregoing allegations as well as other physicians and/or researchers (including physician societies) whose identities are not yet known but will be learned in discovery, (iii) and medical marketing and/or communications vendors, including those listed in the foregoing allegations as well as other vendors whose identities are not yet known but will be learned in discovery.

160.     The Publication Enterprises are ongoing organizations that function as continuing units.  The Publication Enterprises were created and used as a tool to effectuate the Defendants' pattern of racketeering activity.  The Defendants' "persons" are distinct from the Publication Enterprises.  The Defendants were aware of the essential nature and scope of these Enterprise and intended to participate in it.

161.     The Publication Enterprises falls within the meaning of 18 U.S.C. § 1961(4) and consist of groups of "persons" associated together for the common purpose of disseminating publication materials promoting TRT drugs for off-label uses not proven to be safe, effective and useful, and earning profits therefrom.

162.     The Defendants have conducted and participated in the affairs of the respective Publication Enterprises through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.  The unlawful predicate acts of racketeering activity committed, or caused to be committed, by the Defendants throughout the Class Period number in the thousands, and the Defendants committed, or caused to be committed, at least two of the predicate acts within the requisite ten year period.

163.    The Publication Enterprises engaged in and affected interstate commerce, because, *inter alia*, they operated through medical journals with national subscribership, disseminated reprints of articles to physicians across the nation, and were used as part of the Peer Selling Enterprises, which, *inter alia*, marketed, sold, purchased, or provided TRT drugs to thousands of entities and individuals throughout the United States.

164.    The Defendants exerted control over the Publication Enterprises, and participated in their operation or management through a variety of actions including the following:

a.    the Defendants controlled the content of the publications, and the marketing messages contained therein, promulgated by the Publication Enterprises, including the misinformation and false statements concerning the hypogonadism as well as the safety, efficacy, effectiveness, and usefulness of TRT drugs for off-label uses;

b.    the Defendants, and their respective employees and medical marketing and/or communications vendors, controlled the content of the Publication Enterprises publications through ghostwriting, editing, and/or funding or other restrictions for studies requiring pre-approval of publications;

c.    the Defendants selected and approved the physician and/or researcher participants to serve as "authors" of publications promoting a more expansive definition of hypogonadism as well as the off-label messages for TRT drugs contained therein;

d.    the Defendants targeted specific medical journals for TRT drugs or unbranded publications created pursuant to the Publication Enterprises;

e.    the Defendants paid the vendor and physician/researcher participants for their participation in the Publication Enterprises;

f.    the Defendants placed their own employees and agents in positions of authority and control over the Publication Enterprises; and

f.    the Defendants concealed their involvement in the Publication Enterprises such that its publications would have a veneer of credibility as independent and unbiased scientific research.

165.    As detailed above, the Defendants' respective Publication Enterprises consisted of:  (i) creating and disseminating publications deliberately misrepresenting, and causing others

to misrepresent, the prevalence of hypogonadism and the uses for which TRT drugs were safe and effective so that Plaintiff and Class Members paid for these drugs to treat conditions and/or symptoms for which TRT drugs were not scientifically proven to be safe, effective, and useful; (ii) distributing or causing to be distributed reprints of said publications to physicians misrepresenting the off-label uses for which the Defendants knew TRT drugs were not proven to be scientifically safe, effective, and useful to physician attendees and other healthcare providers; (iii) disseminating materials created pursuant to the Publication Enterprises and using those materials to misrepresent, and cause others to misrepresent, the uses for which TRT drugs were safe and effective and useful; (iv) actively concealing, and causing others to conceal, information about the safety, efficacy, and usefulness of TRT drugs to treat conditions for which it had not been approved by the FDA; and (v) actively concealing, and causing others to conceal, the Defendants' involvement in the respective Publication Enterprises.

166.    The Defendants' schemes and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiff and Class Members to pay for excessive amounts of TRT drugs.  Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and Class Members.  The Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiff's and Class Members' property.

167.    The pattern of racketeering activities alleged herein and the respective Publication Enterprises are separate and distinct from each other.  The Defendants engaged in a pattern of racketeering activities alleged herein for the purpose of conducting the affairs of the Publication Enterprises.  Plaintiff and Class Members have been injured in their property by reason of these

violations in that they have made millions of dollars in payments for TRT drugs that they otherwise would not have made had the Defendants not engaged in their pattern of racketeering activities. Plaintiff and Class Members suffered direct consequential and concrete financial loss flowing from the injury to their property by having overpaid for TRT drugs, having received a product or prescription that was worth less than what they paid for it, and thereby suffered out-of-pocket losses. And but for the predicate acts committed or caused to be committed by the Defendants, the Plaintiff and Class Members would not have suffered their RICO injuries.

168.    Plaintiff and Class Members' injuries were directly and proximately caused by the Defendants' racketeering activity, as described above. Plaintiff's and Class members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Defendants' scheme; there is no difficulty posed by having to apportion damages among Class members with different standing or different levels of injury because there are no other injured parties besides the Plaintiff and Class Members in this case, who are the parties directly injured by the Defendants' RICO violations; and there are no others, more directly injured, that could vindicate the Plaintiff's and Class members' claims.

169.    By virtue of these violations of 18 U.S.C. § 1962(c), the Defendants are jointly and severally liable to Plaintiff and Class Members for three times the damages Plaintiff and Class Members have sustained, punitive damages, plus the cost of this lawsuit, including reasonable attorney fees.

## COUNT III - VIOLATION OF 18 U.S.C. § 1962 (C)
### (*DTC Enterprises*)

170. Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

171. Defendants participated in the conduct of the affairs of the respective DTC Enterprises through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

172. The DTC Enterprises are associations-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Defendants, including their employees and agents, the marketing firms and publication firms that Defendants associated with to market TRT drugs directly to patients, and the web designers who created websites to promote unfounded uses directly to consumers.

173. Defendants are a RICO "person" distinct from the DTC Enterprises.

174. Defendants used their respective DTC Enterprises to carry out their schemes to obtain money by means of false and fraudulent pretenses, representations, and omissions.

175. DTC Enterprises are ongoing organizations that functions as continuing units.

176. Defendants and the other members of the DTC Enterprises created and maintained systematic links for the common purpose of gaining revenue from marketing TRT drugs for on and off-label uses. Each of the members of the DTC Enterprises received substantial revenue from marketing TRT drugs. Such revenue was exponentially greater than it would have been if TRT drugs were marketed appropriately.

177. The respective DTC Enterprises have a hub and spoke organizational, decision-making structure, with respective Defendants serving as the hub.

178. The DTC Enterprises engaged in and affected interstate commerce, because, *inter alia*, it marketed, distributed, sold, and provided TRT drugs to thousands of individuals and entities throughout the United States.

179.    Defendants have exerted control over the respective DTC Enterprises and has managed its affairs through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), and § 1952 (use of interstate facilities to conduct unlawful activity).

180.    Defendants' use of, or causation of the use of, the mails and wires to perpetrate their fraud through the DTC Enterprises involved hundreds of communications including, but not limited to: (i) marketing materials and advertisements aimed at patients that misrepresented that TRT drugs were safe and effective for off-label uses for which the drug was not legitimately proven safe and effective; (ii) communications with patients including Plaintiff's and Class Members' participants and their dependents, inducing payments for TRT drugs to be made based on misrepresentations concerning their risks and benefits; and (iii) receiving the proceeds of improper schemes.  The unlawful predicate acts of racketeering activity committed, or caused to be committed, by the Defendants throughout the Class Period consisted of at least two of the predicate acts within a ten year period.

181.    In addition, Defendants' corporate headquarters have communicated by United States mail, telephone, and facsimile with various local district managers, medical liaisons, and sales representatives in order to use the DTC Enterprises to carry out their schemes to obtain money by means of false and fraudulent pretenses, representations, and omissions.

182.    Further, Defendants have traveled in interstate or foreign commerce or used the mail and facilities in interstate or foreign commerce, with the intent to distribute the proceeds of the unlawful activity described above or otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of the unlawful activity described above.

183.    Defendants' racketeering activities related to the DTC Enterprises amounted to a common course of conduct intended to deceive and harm Plaintiff and Class Members.  Each racketeering activity was related, had similar purposes, involved the same or similar members and methods of commission, and had similar results affecting similar victims, including Plaintiff and Class Members.  Defendants' racketeering activities are part of its ongoing businesses and constitute a continuing threat to the property of Plaintiff and Class Members.

184.    Defendants' repeated use of the DTC Enterprises to implement and carry out the fraudulent schemes constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c).  Through that pattern of racketeering activity, Defendants conducted and participated in the conduct of the affairs of the respective DTC Enterprises.

185.    Plaintiff and Class Members have been directly injured in their business and property by reason of Defendant's violations of 18 U.S.C. § 1962(c) in that the pattern of racketeering activity that Defendants used to conduct the affairs of the respective DTC Enterprises directly and proximately caused them to spend excessive, ascertainable sums of money for the purchase, payment, or reimbursement of prescriptions that would not have been purchased, paid, or reimbursed if Defendants had not conducted or participated in the conduct of the affairs of the DTC Enterprises through patterns of racketeering activity.  Plaintiff and Class Members suffered direct consequential and concrete financial loss flowing from the injury to their property by having overpaid for TRT drugs, having received a product or prescription that was worth less than what they paid for it, and thereby suffered out-of-pocket losses.

186.    Plaintiff and Class Members have also been directly injured in their business and property by reason of Defendants' violations of 18 U.S.C. § 1962(c) in that the respective patterns of racketeering activity that are used to conduct the affairs of the DTC Enterprises

directly and proximately caused Plaintiff and the Class Members to spend excessive, ascertainable sums of money for the purchase or reimbursement of TRT drugs sold at a falsely inflated price that would have been significantly lower if Defendants had not conducted or participated in the conduct of the affairs of the DTC Enterprises through patterns of racketeering activity.

187.    Plaintiff's and Class Members' injuries were directly caused by the predicate acts and are not attributable to any independent or intervening factors; their injuries were a foreseeable and natural consequence of the Defendants' scheme; there is no difficulty posed by having to apportion damages among Class Members with different standing or different levels of injury because there are no other injured parties besides the Plaintiff and Class Members in this case, who are the parties directly injured by the Defendants' RICO violations; and there are no others, more directly injured, that could vindicate the Plaintiff's and Class Members' claims.

188.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiff and Class Members for three times the damages they have sustained, punitive damages, plus the cost of this suit, including reasonable attorney's fees.

### COUNT IV - VIOLATION OF 18 U.S.C. § 1962 (C) & (D)
### (*Civil RICO Conspiracy*)

189.    Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

190.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section."

191.    Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Peer Selling Enterprises, the Publication Enterprises, and the

DTC Enterprises described previously through a pattern of racketeering activity that directly caused injuries to the Plaintiff's and Class Members' business or property within the meaning 18 U.S.C. § 1964(c). The corporate defendants conspired with, *inter alia*, publicists, sales representatives, medical professionals, academics and other intermediaries to promote TRT drugs and suppress information about the harms known to result from TRT drug use.

192.    Defendants' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff and Class Members of money.

193.    The nature of the above-described Defendants and their co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracies gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.  In other words, the Defendants adopted the goal of furthering or facilitating the conspiracy, and were aware of the essential nature and scope of the respective Enterprise and intended to participate in it.

194.    As a direct and proximate result of Defendants and their co-conspirator's overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and Class Members have been and are continuing to be injured in their business or property as set forth more fully above.

195.    Defendants and their co-conspirators sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts: (i) multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and

1342; (ii) multiple instances of mail fraud violation of 18 U.S.C §§ 1341 and 1346; (iii) multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346; and (iv) multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

196.     The violations by Defendants and their co-conspirators of the above federal laws and the effects thereof detailed above are continuing and will continue.  Plaintiff and members of the Class have been injured in their property by reason of these violations in that Plaintiff and members of the Class have paid hundreds of millions of dollars for TRT drugs that they would not have paid had Defendants and their co-conspirators not conspired to violate 18 U.S.C. § 1962(c).

197.     Injuries suffered by Plaintiff and members of the Class were directly and proximately caused by Defendants' racketeering activity as described above.  As also set forth above, these injuries would not have occurred but for the Defendants' RICO predicate act violations, and they involved concrete financial losses to the Plaintiff and Class Members.

198.     Patients, physicians, PBMs, P&T Committee members, and TPPs, including Plaintiff and the Class, directly relied on the racketeering activities of Defendants and the Peer Selling Enterprises, the Publication Enterprises, and the DTC Enterprises.  Plaintiff and Class Members, both directly and indirectly, relied on the representations as to the efficacy and safety of TRT drugs as promoted by Defendants.  Because Defendants controlled all knowledge of the tests upon which the claims of TRT drugs' efficacy and safety were based, Plaintiff and Class Members, as well as other members of the medical and consuming public were obligated to rely on Defendants' representations about their TRT drugs.  Further, Defendants perpetuated this reliance by taking the steps itemized above to suppress the dissemination of any critical information about TRT drugs.

64

199.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are jointly and severally liable to Plaintiff and Class Members for three times the damages Plaintiff and Class Members have sustained, plus the cost of this suit, including reasonable attorneys' fees.

200.    By reason of the foregoing, and as a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff and Class Members have suffered damages. Plaintiff and Class Members are entitled to compensatory damages, equitable and declaratory relief, punitive damages, costs and reasonable attorneys' fees.

### COUNT V - VIOLATIONS OF CONSUMER
### PROTECTION STATUTES

201.    Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

202.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent act or practices in violation of the state consumer protection statutes listed below.  The direct and proximate result of Defendants' misrepresentations, unlawful schemes and courses of conduct was the inducement of Plaintiff and members of the Class to purchase, reimburse or pay for TRT drugs.

203.    The actions and failures to act of Defendants (including the false and misleading representations and omissions of material facts regarding the true safety and risk-benefit profile of TRT drugs and the above described course of fraudulent conduct) constitute acts, uses, or employment by Defendants of unconscionable commercial practices, deception, fraud, misrepresentations and the knowing concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression, or omission of material facts in connection with the sale of merchandise of Defendants, all in violation of the consumer protection statutes.

204.     Defendants unfairly, unconscionably, and deceptively advertised, labeled, marketed, represented and sold TRT drugs to Plaintiff and members of the Class without disclosing the true risks and lack of safety and efficacy, through their comprehensive and deceptive promotion program, combined with its misleading drugs labels.

205.     Because Defendants unfairly, unconscionably, and deceptively advertised, labeled, marketed, represented and sold TRT drugs, Defendants knew that TRT drugs were not a more effective or safer treatment than older, cheaper treatment options.

206.     Physicians relied upon Defendants' misrepresentations and omissions in prescribing TRT drugs to patients.   Defendants' misrepresentations and omissions caused Plaintiff and members of the Class to pay for TRT drugs.

207.     Defendants intended that Plaintiff, physicians, consumers, third-party payors, PBMs, and the medical and scientific community would rely on their materially deceptive practices; and that Plaintiff and members of the Class would purchase or pay for TRT drugs as a consequence of the deceptive practices, including Defendants' misrepresentations and omissions of material fact to develop a niche market.   Defendants' deceptive representations and material omissions to Plaintiff and members of the Class were and are unfair and deceptive acts and practices.   Plaintiff and members of the Class were deceived by Defendants' misrepresentations.

208.     Defendants' actions, as complained of herein, constitute unfair, unconscionable, deceptive or fraudulent acts, or trade practices in violation of state consumer protection statutes.

209.     As a proximate result of Defendants' misrepresentations, Plaintiff and members of the Class have suffered an ascertainable loss, in an amount to be determined at trial, in that they paid millions of dollars for TRT drugs that they would not have paid had Defendants not engaged in unfair and deceptive conduct. This injury is of the type the state consumer

protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

210.    Under the statutes listed herein to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices, Defendants are the supplier, manufacturer, advertiser, and seller that are subject to liability for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

211.    By engaging in the foregoing conduct, Defendants have violated the following state Unfair and Deceptive Trade Practices and Consumer Fraud laws:

a.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*;

b.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

c.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE ANN. § 4-88-101, *et seq.*;

d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*;

e.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of COLO. REV. STAT. § 6-1-105, *et seq.*;

f.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42-110b, *et seq.*;

g.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of DEL. CODE ANN. tit. 6, § 2511, *et seq.*;

h.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. CODE ANN. § 28-3901, *et seq.*;

i.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

j. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of GA. CODE ANN. §10-1-392, *et seq.*;

k. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of HAW. REV. STAT. § 480, *et seq.*;

l. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48-601, *et seq.*;

m. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Illinois Consumer Fraud and Deceptive Bus. Practices Act, 815 Ill. Comp. Stat. 505/1, *et. seq*

n. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IND. CODE ANN. § 24-5-0.5-1, *et seq.*;

o. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

p. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of KY. REV. STAT. ANN. § 367.110, *et seq.*;

q. Defendants have engaged in unfair competition or practices in violation of La. Rev. Stat § 51:1401, *et seq.;*

r. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*;

s. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. COM. LAW CODE § 13-101, *et seq.*;

t. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

u. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*;

v. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 8.31, *et seq.*;

w. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MO. REV. STAT. § 407.010, *et seq.*;

x. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, *et seq.*;

y.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

z.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

aa. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A: 1, *et seq.*;

bb. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M Stat.§ 57-12-1, *et seq.*;

cc. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

dd. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

ee. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51-15-01, *et seq.*;

ff. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*;

gg. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. 15 § 751, *et seq.*;

hh. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, *et seq.*;

ii.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of PA. CONS. STAT. § 201-1, *et seq.*;

jj.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. GEN LAWS § 6-13.1-1, *et seq.*;

kk. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

ll.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

mm.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

nn. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

oo. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code § 13-11-1, *et seq.*;

pp. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. § 2451 *et seq.*;

qq. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*;

rr. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*;

ss. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code § 46A-6-101, *et seq.*;

tt. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT § 100.18, *et seq.*; and

uu. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WYO. STAT. ANN § 40-12-101, *et seq.*

212. As a direct and proximate result of Defendants' wrongful conduct as alleged herein, Plaintiff and members of the Class are entitled to compensatory damages, treble damages, attorneys' fees and costs of this suit.

## COUNT VI - VIOLATIONS OF UNIFORM
## DECEPTIVE TRADE PRACTICES ACTS

213. Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

214. Plaintiff asserts this claim for violations of the Uniform Deceptive Trade Practices Act ("UDTPA"), which prohibits "[r]epresenting that goods … have sponsorship, approval, characteristics, … uses, [or] benefits … that they do not have," on behalf of a subclass composed of all Class Members who reside in the twenty-two states who have enacted these provisions of the UDTPA.

215. Defendants engaged in deceptive trade practices in violation of the twenty-two state consumer protection statutes that incorporate the provisions of the UDTPA quoted above, by, *inter alia*, (i) failing to timely alert the public regarding known safety issues with TRT drugs; and (ii) deliberately misrepresenting the safety of TRT drugs relative to other products; and (iii) actively concealing, and causing others to conceal, information about the true safety of the TRT drugs.

216. Defendants have violated the deceptive trade practices statutes of the following states that incorporate the provisions of the UDTPA quoted above, as follows:

     a.    Defendants have engaged in deceptive trade practices in violation of Ala. Code § 8-19-5, *et seq.;*

     b.    Defendants have engaged in deceptive trade practices in violation of Alaska Stat. § 45.50.471, *et seq.;*

     c.    Defendants have engaged in deceptive trade practices in violation of Cal. Civ. Code § 1770 *et seq.;*

     d.    Defendants have engaged in deceptive trade practices in violation of 6 Del. C. § 2532, *et seq.;*

     e.    Defendants have engaged in deceptive trade practices in violation of Ga. Code Ann. §§ 10-1-372, *et seq.* 10-1-393, and 26-2-29 *et seq.;*

     f.    Defendants have engaged in deceptive trade practices in violation of Haw. Rev. Stat. § 481A-3, *et seq.;*

     g.    Defendants have engaged in deceptive trade practices in violation of Idaho Code § 48-603 *et seq.;*

     h.    Defendants have engaged in deceptive trade practices in violation of 815 Ill. L.C.S. § 510/2 *et seq.;*

     i.    Defendants have engaged in deceptive trade practices in violation of 10 Me. Rev. Stat. Ann. § 1212, *et seq.;*

     j.    Defendants have engaged in deceptive trade practices in violation of Mich. Comp. L. Ann. § 445.903 *et seq.;*

k.     Defendants have engaged in deceptive trade practices in violation of Minn. Stat. Ann. § 325D.44 *et seq.;*

l.     Defendants have engaged in deceptive trade practices in violation of Miss. Code Ann. § 75-24-5 *et seq.;*

m.     Defendants have engaged in deceptive trade practices in violation of Neb. Rev. Stat. §§ 81-2,285 *et seq.;*, 87-302 *et seq.*;

n.     Defendants have engaged in deceptive trade practices in violation of N.H. Rev. Stat. § 358-A:2 *et seq.;*

o.     Defendants have engaged in deceptive trade practices in violation of N.M. Stat. Ann. § 57-12-2 *et seq.;*

p.     Defendants have engaged in deceptive trade practices in violation of Ohio Rev. Code § 4165.02 *et seq.*;

q.     Defendants have engaged in deceptive trade practices in violation of Or. Rev. Stat. § 646.608 *et seq.*;

r.     Defendants have engaged in deceptive trade practices in violation of 10 Penn. Stat. § 162.15 *et seq.* and 73 Penn. Stat. § 201-2 *et seq.*;

s.     Defendants have engaged in deceptive trade practices in violation of R.I. Gen. Laws § 6-13-1.1 *et seq.*;

t.     Defendants have engaged in deceptive trade practices in violation of Tenn. Code Ann. § 47-18-104 *et seq.*;

u.     Defendants have engaged in deceptive trade practices in violation of Tex. Bus. & Comm. Code § 17.46, *et seq.*;

v.     Defendants have engaged in deceptive trades practices in violation of Utah Code § 13-11a-3 *et seq.*;

w.     Defendants have engaged in deceptive trade practices in violation of W.Va. Code § 46A-6-102 *et seq.*;

217.     To this date, Defendants continue to engage in the foregoing unlawful practices in violation of the UDTPA and the deceptive trade practices statutes of the above-referenced states that incorporate the UDTPA.

72

218.    As a direct and proximate result of Defendants' wrongful conduct as alleged herein, Plaintiff and members of the Class are entitled to compensatory damages, treble damages, attorneys' fees and costs of this suit.

## COUNT VII - REDHIBITION

219.    Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

220.    Plaintiff brings this Count pursuant to Louisiana Civil Code Articles 2520 *et seq*.

221.    Defendants' TRT drugs contained a vice or defect that rendered them either absolutely useless or its use so inconvenient and imperfect that it must be supposed that the buyers would not have purchased it had they known of the vice.

222.    The Defendants impliedly or expressly represented that their TRT drugs would not cause the adverse health effects described above.  The presence of the unsafe characteristics of the TRT drugs is an absolute vice as provided by Louisiana Civil Code Articles 2520 *et seq*. regarding redhibition, rendering the Defendants liable in redhibition.

223.    Where the Defendants knew of the vice as described above and failed to declare it to Plaintiff, Plaintiff's members, prescribing physicians and the medical community, Defendants are liable for all damages including reasonable attorneys' fees as provided by Louisiana Civil Code Articles 2525 and 1953 *et seq*.

## COUNT XIII - UNJUST ENRICHMENT

224.    Plaintiff restates and incorporates herein by reference the preceding paragraphs as if fully set forth herein.

225.    Defendants, having undertaken the manufacturing, marketing, dispensing, distribution and promotion of TRT drugs described herein, owed a duty to provide accurate and complete information regarding their products.

226.    The misrepresentations and non-disclosures by Defendants of the material facts detailed above allowed Defendants to be unjustly enriched at the expense of Plaintiff and members of the Class.

227.    Plaintiff having purchased and/or reimbursed payments with respect to its members' prescriptions for TRT drugs have unjustly enriched Defendants.  At the time these payments were made, Plaintiff and members of the Class expected that the TRT drugs were safe and medically effective treatments for the condition, illness, disorder or symptoms for which they were prescribed.

228.    In order to maintain sales and profits, Defendants knowingly and intentionally withheld material facts that would have informed Plaintiff and the medical community that TRT drugs' risks outweighed their benefits and that it should not have been a covered prescription medication available to plan members.  The cumulative effect of Defendants' conduct directed at Plaintiff, Plaintiff's members, physicians, PBMs, and consumers was to artificially create a demand for TRT drugs. Defendants' false advertisements and promotional efforts were disseminated for the purposes of unfairly gaining consumer market share through unfair and deceptive conduct.

229.    Defendants have unjustly retained financial benefits at the expense of Plaintiff, the putative Class Members, and the general public.  Defendants' unjust enrichment has caused damage to Plaintiff and members of the Class because Defendants were fully aware that as a result of their wrongdoing, Plaintiff and the Class Members paid for AndroGel and Testim, when they otherwise would not have done so and paid for the drugs at a higher price than would have been paid but for Defendants' wrongful conduct.

230.    As a direct and proximate result of the Defendants' acts, omissions and conduct as set forth above, Plaintiff and members of the Class are entitled to an award of a refund, restitution, and incidental economic losses, including the purchase price paid for the TRT drugs.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Allied Services Division Welfare Fund, individually and on behalf of the Class described herein, respectfully pray for the following relief:

A.    Certification of this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), appointment of Plaintiff as a representative of the Class, and appointment of Plaintiff's counsel as Class Counsel;

B.    Enter joint and several judgments against Defendants in favor of Plaintiff and the Class.

C.    A finding that Defendants' wrongful conduct alleged herein violated the consumer fraud and protection statutes and deceptive trade practices statutes set forth above, and an award for all measures of damages allowable under such statutes, in an amount to be determined at trial, plus costs of suit, including reasonable attorneys' fees and litigation expenses;

D.    Grant Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

E.    Grant Plaintiff and the Class an award for damages and, where applicable, treble, multiple, punitive, and/or other damages, in a such amount to be determined at trial and as provided by applicable law;

F.     Grant Plaintiff and the Class pre-judgment and post-judgment interest on all damages;

G.     Grant Plaintiff and the Class costs of suit, including reasonable attorneys' fees and litigation expenses as provided by law; and

H.     Grant Plaintiff and the Class all such other and further relief as necessary to correct Defendants' unlawful conduct, and as the Court deems just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: October 26, 2015                    Respectfully submitted:

*/s/ James R. Dugan, II*
James R. Dugan, II (LSBA# 24785)
Douglas R. Plymale (LSBA# 28409)
David B. Franco (TXSBA# 24072097)
Lanson Bordelon (LSBA# 34251)
THE DUGAN LAW FIRM, APLC
365 Canal Street, Suite 1000
New Orleans, Louisiana 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-0181
Email: jdugan@dugan-lawfirm.com
Email: dplymale@dugan-lawfirm.com
Email: dfranco@dugan-lawfirm.com
Email: lbordelon@dugan-lawfirm.com

***Attorneys for Plaintiff and the Proposed Class***

And

Art Sadin (TXSBA #17508)
SADIN LAW FIRM, P.C.
121 E. Magnolia Street, Suite 102
Friendswood, Texas 77546
Telephone: (281) 648-7711
Facsimile: (281) 648-7799
Email: asadin@sadinlawfirm.com

***Attorney for Plaintiff Allied Services Division Welfare Fund***

76